**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| Premier Concrete LLC, Keith Woods, ) and Joy Woods, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No.: |
| ) | |
| Argos North America Corp., Argos ) Ready Mix, LLC, Elite Concrete ) LLC, Elite Concrete Holdings, LLC, ) Elite Concrete of SC, LLC, Coastal ) Concrete Southeast II LLC, Evans ) Concrete Holdings Inc., Evans ) Concrete, L.L.C., Thomas Concrete, ) Inc., Thomas Concrete of Georgia, ) Inc., Thomas Concrete of South ) Carolina, Inc., Holcim (US) Inc., ) Cemex, Inc., Cemex Materials, LLC, ) Cemex Southeast, LLC, and Giant ) Cement Company ) | JURY TRIAL DEMANDED |
| ) | |
|     Defendants. ) | |

## <u>COMPLAINT</u>

Plaintiffs, Premier Concrete LLC, Keith Woods, and Joy Woods, allege the following upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters.

1

## INTRODUCTION

1.     This antitrust lawsuit is brought against the participants of two separate but related cartels operating in the portland cement and ready-mix concrete markets in coastal Georgia and southeast coastal South Carolina.

2.     The cement cartel, made up of defendants Argos, Holcim, Giant, and Cemex, are all horizontal competitors and agreed to fix cement prices and monopolize the regional market.

3.     The ready-mix cartel is comprised of defendants Argos, Evans, Thomas, and Elite, who are all horizontal competitors.  This ready-mix cartel engaged in allocating customers, bid rigging, and group boycotts of nonparticipating competitors.  These anticompetitive activities were undertaken with the goal to fix, raise, and stabilize the price of ready mix.

4.     Argos is a vertically integrated international supplier of both cement and ready-mix concrete, and it plays a major role in both cartels.  Argos leverages its dominant position in the upstream cement market to benefit the ready-mix concrete market.

5.     Since at least 2009, the cartel members have conspired to fix prices by agreeing to coordinated price increases, usually representing to customers that the price increases are caused by increased material and distribution costs.

6.     The ready-mix cartel has sought to corner the market by either convincing new business competitors to join the ready-mix cartel, or running them out of business through predatory collusion and excluding them from obtaining supplies.

7.     Cement, which is the central ingredient of ready-mix concrete, is key to the ready-mix cartel's operation.  Argos abuses its dominant position in the cement market by providing information and rebates to certain companies that are part of the ready-mix cartel for the purpose of pricing nonparticipating ready-mix companies out of the market.

8.     This above-described conduct assures that ready-mix cartel members become loyal cement customers upstream, where Argos can maximize its profits.

9.     After getting rid of nonparticipating competitors, the ready-mix cartel raises and fixes prices above competitive rates.

10.     The ready-mix industry requires substantial capital and cash flow, and new businesses start out with an uphill battle simply in dealing with the cartel.

11.     New entrants almost always go out of business because of the cartel's anticompetitive conduct, at which point the cartel resumes its price-fixing scheme.

12.     Both cement and ready-mix customers ultimately suffer damages through overcharges, and competitors of the ready-mix cartel suffer exclusion from the market.

13.     The Plaintiffs have suffered lost profits and other damages resulting from the cartel's conduct. The cartel's conduct also caused Plaintiffs' business to lose value. Because of this decrease in value, Plaintiffs were forced to sell their business for less than they should have. This is further evidenced by Plaintiffs' friends who sold concrete businesses similar to Premier Concrete for significantly more money.

14.     This complaint is an action for conspiracy to restrain trade in the ready-mix concrete market by group boycott under section 1 of the Sherman Act, conspiracy to fix prices in the cement market under section 1 of the Sherman Act, and monopolization, joint monopolization, and conspiracy to monopolize both markets under section 2 of the Sherman Act.

15.     This complaint also puts forth state law claims for tortious interference with business relations and restraint of trade.

## JURISDICTION, PARTIES, AND VENUE

16.     This court has primary subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, because this action arises under the antitrust laws of the United States.

17.     This court has supplemental jurisdiction over the state law claims of the complaint under 28 U.S.C. § 1367 because they are interrelated with the plaintiffs' federal law claims and arise from the same nucleus of operative facts such that they form part of the same case or controversy.

18.     Plaintiff Premier Concrete LLC ("Premier Concrete" or "Premier") is a ready-mix concrete business that supplies concrete for residential and commercial projects in the southeast Georgia and coastal South Carolina areas.  Premier Concrete is a domestic limited liability company formed under the laws of Georgia with its principal place of business located in Rincon, Georgia.  Premier Concrete is owned by plaintiffs Keith Woods and Joy Woods.  In January 2019, Keith and Joy Woods sold all Premier Concrete's operational assets to Nashville-based Smyrna Ready Mix.

19.     Plaintiff Keith and Joy Woods ("the Woods"), a married couple, reside in Guyton, Georgia.  The Woods founded and operated Premier Concrete prior to the sale of its operational assets in January 2019.

20.     Defendants Argos North America Corp. and Argos Ready Mix, LLC, (collectively, "Argos"), together are a ready-mix concrete supplier doing business as Argos in coastal Georgia and southeastern coastal South Carolina.  The Argos companies work together and participate in the market as a single independent center of decision making.

      a.     Defendant Argos North America Corp. ("Argos North America") is a Houston-based wholly owned subsidiary of Cementos Argos, S.A., with offices in Atlanta, Georgia.  Argos North America supplies cement in the United States, particularly in the southeast region.  Argos North America is registered to do business in Georgia and may be served via its registered agent, Corporation Service Company in Norcross, Georgia.  Argos North America is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state.  Argos North America has minimum contacts with this district in that it monopolized a market in this state and conspired to engage in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

      b.     Defendant Argos Ready Mix, LLC ("Argos Ready Mix"), is an Atlanta-based wholly owned subsidiary of Cementos Argos that supplies

ready mix concrete in the southeast United States.  Argos Ready Mix is a mere alter ego of Argos North America, and it does not make independent decisions.  Argos Ready Mix is organized in Georgia and may be served via its registered agent, Corporation Service Company, in Norcross, Georgia. Argos Ready Mix is subject to personal jurisdiction in the State of Georgia because it resides there.

      c.    Argos, its employees, and agents participated personally in the unlawful conduct described in this complaint.  To the extent Argos did not personally participate, it authorized, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

21.    Defendants Elite Concrete, LLC, Elite Concrete Holdings, LLC, and Elite Concrete of SC, LLC (collectively, "Elite"), together are a ready-mix concrete supplier in Walthourville, Georgia owned by SRM Concrete. Elite provides concrete for residential and commercial projects in coastal Georgia and southeastern coastal South Carolina.  The Elite companies, doing business as Elite Concrete, work together and participate in the market as a single independent center of decision making.

      a.    Defendant Elite Concrete, LLC ("Elite Concrete") is organized in Georgia and may be served via its registered agent, Troy Baird, in

Savannah, Georgia.  Elite Concrete is subject to personal jurisdiction because it resides in Georgia.

      b.     Defendant Elite Concrete Holdings, LLC ("Elite Holdings"), is organized in Georgia and may be served via its registered agent, Troy Baird, in Savannah, Georgia.  Elite Holdings is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

      c.     Defendant Elite Concrete of SC, LLC ("Elite SC"), is registered to do business in Georgia and may be served via its registered agent, Troy Baird, in Savannah, Georgia.  Elite SC is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state.  Moreover, Elite SC has minimum contacts with this state in that it conspired to engage in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

      d.     Elite, its employees, and agents participated personally in the unlawful conduct described in this complaint.  To the extent Elite did not personally participate, it authorized, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

22.    Defendant Coastal Concrete Company, Inc. is a Pooler, Georgia based ready mix concrete company doing business as Coastal Concrete that provides concrete for residential and commercial projects in coastal Georgia and South Carolina.  On information and belief, Coastal Concrete Company, Inc., was acquired by Thomas Concrete in 2015.  Defendant Coastal Concrete Southeast II, LLC ("Coastal Concrete"), is organized in Georgia and may be served via its registered agent, Thomas Cullen, in Savannah, Georgia.   Coastal Concrete is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

23.    Defendants Evans Concrete Holdings, Inc., and Evans Concrete, LLC (collectively, "Evans"), are a Claxton, Georgia, based ready-mix concrete supplier doing business as Evans Concrete in coastal Georgia and southeastern coastal South Carolina.  The Evans companies work together and participate in the market as a single independent center of decision making.

a.    Defendant Evans Concrete, L.L.C. ("Evans Concrete"), is organized in Georgia and may be served via its registered agent, Timothy Strickland, in Claxton, Georgia.   Evans Concrete is subject to personal jurisdiction in the state of Georgia because it resides in Georgia.

b.    Defendant Evans Concrete Holdings, Inc. ("Evans Holdings"), is incorporated in Georgia and may be served via its registered agent, Timothy

Strickland, in Claxton, Georgia.  Evans Holdings is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

c.    Evans Holdings, its employees, and agents participated personally in the unlawful conduct described in this complaint.  To the extent Evans Holdings did not personally participate, it authorized, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

24.    Defendants Thomas Concrete, Inc., Thomas Concrete of Georgia, Inc., and Thomas Concrete of South Carolina, Inc. (collectively, "Thomas"), are an Atlanta, Georgia, based ready mix concrete supplier doing business as Thomas Concrete that provides concrete for residential and commercial projects in coastal Georgia and South Carolina.  The Thomas companies participate in the market as a single independent center of decision making.

a.    Thomas Concrete, Inc. ("Thomas Concrete") is registered to do business in Georgia and may be served via its registered agent, Alan Wessei, in Atlanta, Georgia.  Thomas Concrete is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state.  Thomas Concrete has minimum contacts with this state in that it conspired to engage

10

in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

b.      Thomas Concrete of Georgia, Inc. ("Thomas Georgia") is incorporated in Georgia and may be served via its registered agent, Fredrik Hoeglund, in Atlanta, Georgia.   Thomas Georgia is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

c.      Thomas Concrete of South Carolina, Inc. ("Thomas South Carolina") is registered to do business in Georgia and may be served via its registered agent, Lawson William Porter, in Atlanta, Georgia.  Thomas South Carolina is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state.   Thomas South Carolina has minimum contacts with this state in that it conspired to engage in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

d.      Thomas, its employees, and agents participated personally in the unlawful conduct described in this complaint.  To the extent Thomas did not personally participate, it authorized, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

25.     Defendant Holcim (US), Inc. ("Holcim US") is the United States subsidiary of an international cement supplier.  In 2015, Holcim's parent company, Holcim Ltd., and another international cement supplier, Lafarge, merged to become LafargeHolcim which now claims to be the largest manufacturer of building materials in the world.  Holcim US is registered to do business in Georgia and may be served via its registered agent, CT Corporation System, in Lawrenceville, Georgia.  Holcim US is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state.  Holcim US has minimum contacts with this state in that it conspired to fix prices in this state, and this lawsuit is related to those contacts.  Holcim US, its employees, and agents participated personally in the unlawful conduct described in this complaint.  To the extent Holcim US did not personally participate, it authorized, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

26.     Defendants Cemex, Inc., Cemex Materials, LLC, and Cemex Southeast, LLC (collectively, "Cemex"), are United States subsidiaries of international cement supplier Cemex S.A.B. de C.V. doing business as Cemex and/or Cemex USA.  The Cemex companies work together and participate in the market as a single independent center of decision making.

12

a.      Defendant Cemex, Inc. ("Cemex, Inc."), is registered to do business in Georgia and may be served via its registered agent, Corporate Creations Network, Inc., in Marietta, Georgia.  Cemex, Inc., is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state.  Cemex, Inc., has minimum contacts with this state in that it conspired to fix prices in this state, and this lawsuit is related to those contacts.

b.      Defendant Cemex Materials, LLC ("Cemex Materials"), is registered to do business in Georgia and may be served via its registered agent, Corporate Creations Network, Inc., in Marietta, Georgia.  Cemex Materials is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state.  Cemex Materials has minimum contacts with this state in that it conspired to fix prices in this state, and this lawsuit is related to those contacts.

c.      Defendant Cemex Southeast, LLC ("Cemex Southeast"), is registered to do business in Georgia and may be served via its registered agent, Corporate Creations Network, Inc., in Marietta, Georgia.  Cemex Southeast is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-

13

10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state. Cemex Southeast has minimum contacts with this state in that it conspired to fix prices in this state, and this lawsuit is related to those contacts.

      d.    Cemex, its employees, and agents participated personally in the unlawful conduct described in this complaint. To the extent Cemex did not personally participate, it authorized, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

27.    Defendant Giant Cement Company ("Giant") is a subsidiary of Giant Cement Holding, Inc., which is majority owned by Elementia, S.A.B. de C.V.

      a.    Defendant Giant is incorporated in Delaware with its principal place of business in Harleyville, South Carolina. It is registered to business in Georgia, and may be served via its registered agent Corporate Creations Network Inc., in Marietta, Georgia.

      b.    Giant is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and committed tortious acts within this state. Giant has minimum contacts with this state in that it conspired to engage in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

c.      Giant, its employees, and agents participated personally in the unlawful conduct described in this complaint.  To the extent Giant did not personally participate, it authorized, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

28.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 139l(b)(1) and 15 U.S.C. §§ 15, 22 because defendant Argos Ready Mix resides in this district.

## FACTUAL ALLEGATIONS

29.     Starting in approximately 2009, Argos, Evans, Elite, and Coastal (later Thomas) combined and conspired to jointly monopolize and ultimately fix prices in the market for ready-mix concrete in coastal Georgia and coastal South Carolina. Their combined market share exceeded 80 percent at all times.  These companies formed a cartel to dominate the market and conspired to protect that domination from competitive threats.  Argos' ability to price supracompetitively in the cement market facilitated the success of the ready-mix cartel.

30.     When a ready-mix concrete company (that was sufficiently large to handle substantial projects and compete with the ready-mix cartel) entered the market, the ready-mix cartel attempted to recruit the competitor to avoid price competition.

31.     If the competing ready-mix business, like plaintiff Premier Concrete, was unwilling to cooperate in the price-fixing and market-allocation scheme, then the ready-mix cartel employed effective punishment tactics designed to assure compliance or to drive the new entrant out of the market.  These tactics included:

a.     Trusted employees of the conspiring firms took turns following the competitor's trucks to job sites and reporting back to the cartel members with information regarding the competitor's customers and job locations;

b.     Argos manager Jim Pedrick determined the amount of cement that the rogue ready-mix price competitor was purchasing.  If the competitor was purchasing from Argos' cement competitors, Pedrick was also able to obtain information on the ready-mix competitor's purchase volume.  This is because Argos and its cement competitors separately agreed to an anticompetitive course of conduct in the cement market and to trade competitively sensitive information.  The cartel determined how much concrete the competitor was selling based on its cement purchases, which allowed the cartel to assess the degree of competitive threat and the competitor's ability to withstand the cartel's collusive efforts;

c.     Cartel members would then use this information to offer significant price cuts to the hard-earned customers of the rogue ready-mix

competitor.  By engaging in this type of bid rigging, the cartel members could collectively withstand significantly more losses in order to take the competitor's customers.  When the rogue competitors inevitably left the market, the cartel members, individually and collectively, then raised prices again to supra-competitive levels and recouped any losses from the price cuts;

d.      Additionally, Argos provided rebates of up to 50 percent on cement purchases when certain cartel members engaged in the above-described predatory pricing, which significantly (and artificially) decreased the costs of materials to allow the members even more room to engage in predatory pricing. This practice allowed the cartel to put the target competitor out of business quicker.  Argos could afford such steep rebates because it was already pricing supra-competitively as a monopolist and/or because it had agreed to fix prices and allocate customers and markets with its cement competitors.  Argos also maintained its monopoly power in the cement market by ensuring its concrete customers (also cartel members) became loyal cement customers in return for sharing its monopoly rents when engaging in predatory conduct;

e.      Argos worked with its conspirators in both markets to make it more difficult or impossible for low-price competitors to obtain essential

materials for concrete, such as rock and cement.  For example, Argos and Holcim both agreed not to supply cement to plaintiff Premier Concrete, as well as Baca Concrete and Bulloch Concrete, because they competed on price with the concrete cartel;

f.      Argos supplied the cartel members with information derived from its illegal price-fixing conspiracy with Holcim, Giant, and Cemex to set cement prices by disclosing the future price of cement before it became public. This gave the cartel members an advantage in outbidding a competitor in the market; and

g.      In some cases, Argos or other members of the cartel purchased the competitor after it has been substantially weakened as a business.

32.    Once a competitor was no longer a threat, the ready-mix cartel reengaged in its ready-mix price-fixing scheme through which its members overcharged their customers as much as $15 per yard (more than a 20 percent overcharge).  The members each took turns winning or sharing jobs in certain market areas to ensure that premium prices were charged to customers, thereby avoiding competition with each other.  Premier Concrete was a target of the ready-mix cartel. Southeast Ready Mix, LLC ("Southeast Ready Mix"), and Mayson Concrete, LLC

("Mayson Concrete"), are concrete businesses that were also targeted by the ready-mix cartel.

**Targeting Southeast Ready Mix, Mayson Concrete, and Premier Concrete**

33.   Beginning in 2007, Jason Wells opened a ready-mix plant and began operating as Mayson Concrete in the Savannah and Statesboro markets. Mayson Concrete immediately gained market share by pricing competitively.

34.   In 2010 Argos, which had a close relationship with Elite Concrete due to two brothers (Greg Melton, of Argos, arid David Melton, who went directly from managing Lafarge Concrete ready mix operations to managing Elite) working for each of the respective companies, began meeting with representatives of Evans and Coastal to discuss strategies to undercut Mayson Concrete in pricing. Mayson Concrete was a small, relatively new company still developing its footing in the market, and Argos knew that Mayson Concrete was vulnerable in a business that depends heavily upon capital and cash flow.

35.   The ready-mix cartel made great efforts to put Premier Concrete and the other ready-mix competitors out of business. They followed Premier's and the other competitors' trucks around to job sites and took turns predatorily undercutting it on price to those same customers, gradually eroding their customer base. The members also agreed amongst themselves not to do business with Premier and the

other competitors and attempted to raise the ready-mix competitors' cement prices

higher than for members of the cartel. For example:

      **a.**    **2009.**  Elite Concrete's Troy Baird came to Premier Concrete's

office to "meet and greet" Keith and Joy Woods; before Baird left he asked

Keith Woods if Premier would stay in Effingham County and not compete in

the Savannah area.  Keith Woods told Baird that Premier would not do that

due to Premier's many customers throughout the greater Savannah area.

      **b.**    **June 2009.**  Argos stopped supplying cement to Premier

Concrete.

      **c.**    **September 2010.**  Jason Townsend, a Premier salesman at the

time, informed Plaintiffs that an Argos concrete salesman, and Argos concrete

manager Greg Melton, dropped the price to Premier Concrete's customer, J.N.

Thompson Construction, to $10 per yard on a 6,000 yard job (a large job for

Premier).  This forced Premier to supply its customer below Premier's profit

margin, as Premier had already committed to the job and purchased the

materials.

      **d.**    **October 2010.**  Argos hired Premier's salesman Jason

Townsend, thereby gaining Premier Concrete's customer and price list.  By

the end of 2010, Argos' salesmen targeted Premier's customers.  Argos'

activities included, but were not limited to, following Premier's trucks to job sites and price cutting.

      **e.**    **February 2011**.  Argos' Jim Pedrick, Giant's Dan Clary, and a Holcim sales representative Jimmy Carson, each stopped by Premier Concrete's office the same day, one to two hours apart.  They each let Premier know of an upcoming price increase.  The Woods were present during these visits, as well as Premier's Bruce Jones and Sheila Saxon.  Argos and Holcim did not even sell cement to Premier at the time of this meeting.

      **f.**    **2012.**  Argos and Elite worked together throughout 2012 to gain Premier Concrete's largest customers by following Premier's trucks to job sites and price cutting Premier's customers such as First Choice, Fred Williams, Ernest Homes and Roulliard Concrete Construction.

      **g.**    **February 28, 2012.**  Jim Pedrick, a former cement salesman for Argos, served as the middle-man between Tim Coughlin, president of Coastal, and Argos concrete managers including Greg Melton, and Troy Baird, co-owner of Elite.  They exchanged price-increase letters through Pedrick to confirm their compliance with the agreement to increase prices.

      **h.**    **March 12, 2012.**  Greg Melton of Argos told his sales team they could match any prices of Elite and Coastal, but they were not allowed to

undercut Elite or Coastal in price.  Melton also instructed sales representatives to aggressively target Premier Concrete and Mayson Concrete because they refused to participate in the conspiracy.

      **i.**    **2013.**  Coastal Concrete's Tim Coughlin took Keith Woods to a lunch meeting with one of Coastal Concrete's investors.  The meeting was at Sam Snead's restaurant near the airport, as the investor had just flown in for the meeting.  They asked Keith if he would be willing to "give up" and become a small shareholder of Coastal Concrete or, alternatively, sell Premier Concrete to Coastal Concrete for $600,000.

      **j.**    **2013.**  Also in 2013, Jim Pedrick from Argos, Dan Clary from Giant, and Jimmy Carson from Holcim Cement each made separate visits on the same day to Premier Concrete's office.  The visits occurred within two hours of each other.  Again, these representatives stated the purpose of their visit was to alert Premier of upcoming price increases.  These representatives also visited Alan Zipperer at nearby Diamond Concrete.

      **k.**    **2013-2014.**  Argos' Jim Pedrick stopped by Premier Concrete in 2013 and 2014, stating that he was "in the area."  On both occasions, Premier asked Pedrick for an account with Argos.  Pedrick rebuffed Premier both times, replying that Argos was not taking new customers.

l.     **2014-2015.**  Dan Clary with Giant informed Plaintiffs that Giant could no longer supply them with cement, and that it was not taking any more business at that time due to a large Department of Transportation project in Augusta, Georgia that Giant was supplying cement to. Premier received no notice, and Dan Clary said it would be effective immediately. This put Premier at a huge disadvantage, and Clary knew Premier could not get cement from Argos or Holcim. Premier was forced to go to Florida to get cement from Suwannee Cement in Branford, Florida, which was a long drive from Savannah, Georgia. Dan Clary also told Alan Zipper with Diamond Concrete that Giant was not taking on anymore business.

m.     **2016.**  David Melton asked to meet Keith Woods for lunch. Melton shared that he was no longer with Elite Concrete, and had interest in working for Premier Concrete.  David stated that good things would happen and that there would be plenty of work because of his brother, Greg Melton, with Argos.

n.     **2016.**  Also in 2016, Premier opened a third plant in Hardeeville, South Carolina (approximately 20 miles from the Georgia plant).  When the plant opened, Dan Clary from Giant informed Premier that Giant was implementing a $10 per ton price increase for Premier's Hardeeville plant to

avoid disruption to Giant's existing Hardeeville customers (Palmetto Ready Mix and Low Country Concrete).

      **o.**     **March 23, 2016:**  Mike Taylor of Argos told salesmen not to compete with Evans or Thomas for jobs.  In contrast, Taylor directed salesmen to undercut Southeast Ready Mix, emphasizing that control of the Savannah market by the cartel was crucial because Argos sells cement to itself and cartel members from the Savannah port.

      **p.**     **April 27, 2016:** Mike Taylor instructed his sales team to target Elite and Southeast Ready Mix but not to compete with Thomas because they would continue with the agreement.  Argos sought to punish Elite because David Melton left as Elite's manger, and Elite no longer participated in the cartel.

      **q.**     **June 2, 2016:** Greg Melton of Argos bid on a job for Joe n' Guy next to the Southeast Ready Mix plant that both companies were bidding on. He stressed that the bid was below cost and stated that, even if unsuccessful, it would cause Southeast Ready Mix to adjust its price and take a loss for the job.

36.    By 2012, Mayson Concrete was going out of business because of the cartel's anticompetitive conduct.  Andy Stankwych, Argos' regional manager told

his team on March 6, 2012, to coordinate with competitors to come up with a plan for a price increase due to the less competitive environment.

37.     However, Southeast Ready Mix owner Jason Wells partnered with Mark Turner in a new firm, which purchased Mayson Concrete's plants and other assets.  This hindered the cartel's coordinated price increase.

38.     Around mid-April 2012, the cartel first attempted to convince Mark Turner to put out a price increase letter as the members of the cartel had planned. Trey Cook of Elite met Turner at Savannah Bank, where he told Turner that Coastal, Argos, and Elite all had agreed on new environmental fees and surcharges and that Southeast Ready Mix should too.  Turner refused to join in the coordinated price increases.

39.     The cartel members then decided to follow the Southeast Ready Mix trucks to job sites.  In the process, the members obtained Southeast Ready Mix's pricing and cement order information from Argos and Holcim, allocated customers and markets, and used cement rebates and credits to predatorily undercut Southeast Ready Mix by pricing below cost:

   a.     **April 3, 2012:** Greg Melton (Argos) and David Melton (Elite) discussed details of price stabilization efforts by phone and decide that the

25

cartel participants would add a fuel surcharge to all ready-mix concrete deliveries.

      **b.**      **May 15, 2012:** Pedrick relayed to Argos concrete management that cartel members would boycott buying sand from Clark Block because of his business and familial relationships with Mark Turner and Jason Wells at Southeast Ready Mix.

      **c.**      **May 23, 2012:** An Argos employee followed a Southeast Ready Mix truck to job sites in order to gain intelligence on its customers and pricing to share with cartel members.

      **d.**      **May 30, 2012:** Greg Melton (Argos), Andy Stankwych (Argos), and Trey Cook (Elite) met for breakfast at Cracker Barrel, at which time Melton informed the group that Elite had to drop its price below $86 per yard for specific jobs due to competition from Southeast Ready Mix.

      **e.**      **June 19, 2012:** Greg Melton informed the Argos management team that it will use Premier's and Southeast Ready Mix's customer lists it obtained from following their trucks to allocate certain customers to Evans. He also stated his plan of undercutting Premier and Southeast Ready Mix on price with their largest customers.

**f.     October 25, 2012:** Argos and Coastal Concrete discussed a coordinated price increase of $7 per yard to occur January 1.

**g.     October 31, 2012:** Greg Melton and Bo Strickland of Evans used the "Statesboro scorecard" to coordinate bids for certain jobs. The scorecard allowed members of the cartel to alternate winning or sharing jobs in the Statesboro area. This ensured that premium prices were charged to customers, or that losses are shared in undercutting competitors such as Premier.

**h.     May 14, 2013:** Argos internally discussed undercutting Southeast Ready Mix using pricing intelligence gathered on them. This would be done by pricing below cost, and then recouping the losses later.

**i.     October 11, 2013:** After talking to the other cartel members, Pedrick told Argos ready mix leadership that Evans and Elite will agree to the price increase.

**j.     October 17, 2013:** Pedrick confirmed that Bo Strickland (Evans) agreed to an $8 per yard ready mix price increase.

**k.     October 18, 2013:** Pedrick confirmed that Argos' and Coastal Concrete's price increase letters for $8 per yard have gone out.

40.     Greg Melton (Argos) and David Melton (Elite) regularly met at Sunrise Restaurant to discuss cartel strategy from the beginning of the cartel's formation

until David Melton left Elite in late 2015. During these meetings, they would exchange sensitive price, output, and competitor information. They used Pedrick to implement the plan with other cartel members in an attempt to make their activities appear legitimate, as Pedrick supplied them with cement.

## Green Zones

41.     In 2016, the cartel members decided to carve out geographic areas of the market in which all jobs were to be allocated to a particular cartel member.

42.     To implement this plan, Argos cement established "green zones," the area around its ready-mix plants and those of each cartel member, with a radius of about five miles or 15 minutes' drive from the plant. At least for Argos and Evans, any concrete job within a "green zone" would receive an automatic cement credit/rebate, typically of $15 dollars. On information and belief, Argos may have also extended the rebates to other cartel members. These rebates and credits ensured that a cartel member bidding in its zone would be successful against non-cartel members such as Premier.

43.     Any ready-mix cartel member that bid on jobs within the green zone would be subjected to numerous consequences to ensure compliance. Jim Pedrick warned the other ready-mix companies not to build a concrete plant within a green zone or else it would lose of all its cement advantages or price cutting near the

cheating cartel member's plants. Additionally, Argos often instructed its sales teams to bid high on jobs near ready mix cartel members' plants to avoid competition in green zones.

44.     The cartel regularly discussed the green zones as part of its strategy to exclude Premier and other nonparticipating competitors:

    a.     **March 3, 2016:** Greg Melton told the Argos sales team that Argos USA will provide cement credits on certain jobs so that Argos could undercut Premier and other competitors on bids.

    b.     **March 7, 2016:** The cartel members discussed the green zone policy and selective predatory price-cutting strategy to eliminate Premier and other competitors.

    c.     **April 1, 2016:** Jim Pedrick gave Greg Melton a $15 per ton rebate on cement so that Argos could undercut Southeast Ready Mix and steal Jett Concrete, one of Southeast Ready Mix's loyal customers.

    d.     **April 8, 2016.** Greg Melton and Jim Pedrick agreed to cement credits/rebates in an unsuccessful attempt to undercut Southeast Ready Mix for a Circle K job.

    e.     **May 12, 2016.** Greg Melton discussed with the cartel members how the green zone strategy had successfully won them jobs, and further

discussed additional ways in which the selective rebate/predatory price-cutting strategy could provide competitive advantages.

### Cement Market Anticompetitive Behavior

45.    Argos' dominant position in the cement market for coastal Georgia and South Carolina played an essential role in the ready-mix cartel's ability to punish and exclude nonparticipating competitors. Argos participated in the ready-mix cartel downstream, which is structured to cause its members to become loyal cement customers upstream, where Argos maintained monopoly power and maximized its profits. Argos shared these profits with the downstream cartel to engage in predatory conduct.   In turn, the ready-mix cartel was able to raise and fix prices above competitive levels once it got rid of nonparticipating competitors.

46.    Argos maintains its dominant position in the coastal Georgia and South Carolina cement market.   In the Savannah area, Argos has approximately 70% market share among cement suppliers, with Giant holding about 20% and Holcim holding about 10%.  After purchasing LaFarge in 2011, Argos has held a complete 100% market share in Statesboro.   Additionally, Cemex has a significant market share in Atlanta, and its participation makes price-fixing among cement suppliers more effective.

47.     There are two main ways Argos used its monopoly power in the cement market.  First, Argos participated in the ready-mix concrete cartel downstream, which ensures its members become loyal cement customers upstream.  This allowed Argos to maintain and reinforce its existing dominant position in the cement market.  Second, by leveraging its monopoly power in the cement market, Argos and the other members created anticompetitive conditions in the downstream market for ready-mix concrete to jointly monopolize and ultimately fix prices in the coastal Georgia and South Carolina market.  This scheme allowed Argos to keep tabs on concrete suppliers, such as Premier Concrete, to further the downstream concrete cartel's goals.  Premier was harmed both as an end-purchaser of cement and as a targeted competitor in the downstream ready-mix concrete market.

48.     Since at least 2009, Argos, Cemex, Giant and Holcim conspired to fix prices in the cement market and to exchange competitively sensitive information about pricing and customers. For example:

a.      On or around October 25, 2012, Jim Pedrick of Argos and Dan Clary of Giant Cement discussed a coordinated price increase in the Savannah market that would start at the beginning of 2013.

b.      On or around August 27, 2013, Jim Pedrick and representatives from Holcim, Giant, and Cemex agreed to a $8 per ton price increase starting

on January 1, 2014. Pedrick stated on or around August 30, 2013 that Argos' attorneys instructed him to delay the price increase until January 15 to reduce the chance of detection.

      c.    In 2016, Bill Wagner, president of Argos North America, negotiated a coordinated $14 per ton cement price increase with Cemex and Holcim.

      d.    On March 26, 2016, Mike Taylor and Argos' ready-mix management team received confirmation from Argos North America's accountant that the cement suppliers agreed to an April 1 price increase.

      e.    Holcim and Argos (and earlier, Lafarge) consistently exchanged "market reports" containing sensitive pricing and output information.

### Suppliers and Markets

49.    The main product markets at play in this case are the markets for portland cement and ready-mix concrete.

50.    Portland cement is a binding agent essential to any ready-mix concrete mixture. It holds components of concrete together. Portland cement is subject to established industry and governmental standards that ensure its consistency and uniformity. As a result, portland cement is a commodity that is interchangeable and homogeneous across manufacturers. There are only six major suppliers of portland

cement, however, and these suppliers control substantially all of the supply of portland cement in the Western Hemisphere.  Because industry standards require its use, there are no real substitutes for portland cement.

51.    Ready-mix concrete suppliers are the primary purchasers of portland cement.  Ready-mix suppliers typically pick up portland cement from a cement company's plant or terminal in trucks.  A price increase is unlikely to cause customers to change to other products because there are no close substitutes for portland cement, and its price represents a relatively small percentage of a project's overall construction costs.

52.    Barriers to entry are high in the cement market.  To be competitive, it would likely cost over $300 million and take more than five years to permit, design, and build a new portland cement plant.  To expand an existing facility would likely even cost hundreds of millions of dollars and take four or more years to complete.

53.    It is also difficult to build competitive cement distribution terminals.  It can take more than two years to acquiring a suitable location, obtaining the necessary permits, and completing construction of a competitive terminal in the relevant markets.

54.    Ready-mix concrete is manufactured in a batching plant according to a set mix design (i.e., recipe) that is then delivered to a work site by a mixer truck in

a freshly mixed, unhardened state.  Portland cement, water, sand, gravel, crushed stone, and sometimes additives such as fibers, mesh, and chemical admixtures are in the mixture.  Ready-mix concrete is designed to be a precise mixture that is ready to be placed, molded, and formed upon arrival to the site.

55.    The ready-mix concrete production, delivery, and use process is subject to well-established industry and governmental standards.  This includes those published by ASTM International, American Concrete Institute, and a variety of state and federal transportation agencies that ensure the consistency and uniformity of ready-mix.

56.    Ready-mix concrete is an interchangeable and homogeneous commodity across manufacturers.  Because of its exceptional characteristics as a building material, a price increase would not cause ready-mix concrete customers to switch to other materials.

57.    Portland cement and ready-mix concrete's interchangeability make their markets more conducive to cartel activity.  The FTC has analyzed the cartelized nature of both markets in two recent merger decisions, stating:

> The relevant markets are vulnerable because they are highly concentrated; cement is a homogenous product; and· sales are small, frequent, and usually not made pursuant to long-term contracts. The markets also exhibit a high degree of transparency: competitors are commonly aware of each other's production capacities, costs, sales volumes, prices, and customers. The evidence indicates that the

merging firms already closely monitor competitors' cement pricing and sales, which facilitates coordination.

*In the Matter of Holcim Ltd. and Lafarge S.A.,* FTC File No. 141-0129. In a separate case, the FTC stated that when dealing with a homogenous product like ready-mix concrete, coordination is particularly likely. *See In the Matter of Cemex, S.A. de C.V.,* File No. 0510007, Docket No. C-4131.

58.    Both the cement and ready-mix concrete markets are homogenous, and the high degree of transparency makes collusion more likely in these markets because competitors are commonly aware of each other's production capacities, costs, sales volumes, prices, and customers.  This makes it easier to monitor the scheme and punish those who deviate from it.

59.    The relevant geographic market for portland cement spans across coastal Georgia and coastal South Carolina.  The density of a specific region, as well as local transportation costs, are just some of the factors that determine how large an area a particular plant or terminal can service.  High transportation costs render cement markets local or regional in nature. The raw materials are mined, processed, and milled into cement at these mills.

60.    Cement suppliers are unlikely to supply customers further than 200 miles because the cost of transport rises. Moreover, customers more than 200 miles away are likely to be closer to another cement mill. For example, cement terminals

for Argos are located in Savannah, Georgia, and Holcim's and Giant's plants are located in or near Harleyville, South Carolina.  Cemex in Clinchfield, Georgia is twice as far from cities such as Statesboro, Savannah, and Hilton Head/Bluffton as the mills in Harleyville, South Carolina, where Premier's plants are, and thus is less competitive in those areas.

61.   The relevant geographic markets for ready-mix concrete are mainly comprised of Statesboro, Georgia; Savannah, Georgia; and Hilton Head/Bluffton, South Carolina.  Ready mix concrete markets are highly localized in nature. High transportation costs and a limited time from batching to curing limit the geographic scope of ready-mix concrete markets:

a.    Logistically, being close in distance between the site and the plant is critical. For one, transportation costs comprise a significant proportion of the cost of the final delivered product.  A low value-to-weight ratio effectively limits the distance that ready mix concrete can be shipped. Second, ready mix concrete is perishable. Once it is blended at a plant and loaded into a truck, it will solidify after about an hour if it is not poured.  Accounting for time between batching and transport and pouring, setup at the job site, and the time it takes to actually pour and place the concrete, ready mix suppliers

typically limit their mixer drive time to a radius of about 20- 30 minutes from the plant.

b.      Statesboro, Savannah, and Hilton Head/Bluffton are thus too far away from one another for a plant in one of these locations to profitably service another.

62.     The ready-mix concrete defendants have market power:

a.      **Statesboro.** Argos has approximately 49% market share and Evans has approximately 49% market share.

b.      **Savannah.** Argos has approximately 30% market share, Coastal/Thomas: 30% market share; Elite: 15%; Premier: 12%; Southeast Ready Mix: 12%; and other: 1%.

c.      **Hilton Head/Bluffton.** Argos has approximately 15% market share; Coastal/Thomas: 15%; Elite: 25%; Palmetto: 10%; Premier: 15%; and Southeast Ready Mix: 20%.

63.     Ready-mix concrete competitors must overcome barriers to entry such as investment into ready-mix concrete manufacturing facilities, mixer trucks, material costs, and substantial cash-on-hand.

64.     The cement cartel has market power in the market for portland cement. Argos' market share in the coastal Georgia and southeastern coastal South Carolina

market is approximately 70%.  The cement cartel has more than 90% market share when you add Holcim, Giant, and Cemex, and it has the ability to raise prices and exclude competition.

## Damage to Premier and the Competitors

65.     Premier Concrete and other competitors that did not participate in the ready-mix cartel paid supra-competitive prices for cement and were competitively disadvantaged by Argos' rebate and credit scheme and the cement cartel's supra-competitive price-fixing scheme.  Premier was also harmed through lost business and other injury by the Defendants' exclusionary conduct.  This injury includes, among others, the reduction in Premier's sales volume resulting directly from the defendants' anticompetitive conduct.  This hindered Premier's ability to achieve necessary economies of scale and eliminated its profits and expansion opportunities in the defined relevant markets.

66.     Another ready-mix competitor, Mayson Concrete, was completely pushed out of the market and became insolvent in late 2011.  Because of the defendants' conduct, Mayson Concrete was unable to make a profit and had to purchase cement, aggregates, and other materials on credit.  By early 2012, Mayson Concrete fell $1.5 million in debt, and lacked the income to pay it off.

67.    The cement cartel's separate anticompetitive conduct in the market for portland cement downstream harmed ready-mix concrete consumers through reduced competition and increased prices.

68.    Beginning in 2009, Premier Concrete began losing money in its business.  Premier continued to lose money through 2013.  The Woods were not aware of, and did not understand, the defendants' anticompetitive behavior during this time.

69.    In the several years before 2009, Premier Concrete was able to sell its concrete for an average of about $95 per square yard.  From 2009-2013, however, Premier was not able to sell at those prices.  Instead, they were only able to sell concrete for $91 per yard in 2009, and anywhere from $66-$78 from 2010-2013. Premier lost almost $6 million over those 5 years from the reduced prices.

70.    Premier Concrete also lost jobs because of the downward market pressure on concrete prices and being undercut on bidding by the ready-mix cartel. Keith Woods also had a contracting business that he had to ramp up during this time just to keep Premier from going out of business. One particular market where Premier suffered was Pooler, Georgia. During the time period that the material events giving rise to this complaint occurred, Pooler was one of the fastest growing areas in Georgia. Despite the high demand for concrete in Pooler, however, Plaintiffs

could not obtain a job to supply concrete in the city as a result of the Defendants' anticompetitive behavior.

71.    Premier Concrete's salesmen and customers observed that Argos' salesman, Jim Pedrick, would follow the Premier trucks to job sites and then try to undercut Premier on price.  On information and belief, Pedrick has since left Argos to work at Cemex.

72.    On multiple occasions, some of which involved jobs where Premier already had a purchaser order for a job to supply concrete, Argos would cut their prices shortly before the job was to be poured. For example, Premier had a purchase order to provide concrete to Ebenezer Road in Effingham County. On the day before the start date, Premier salesman Jamie Deloach stopped by the job site to coori-date trucks, but the general contractor on the job told him they were going to use Argos instead because Argos had cut their prices significantly. During this same time period, Argos significantly cut their prices for a job at the Lexus car dealership in Hardeeville, South Carolina one day before Premier was to start providing the concrete.

73.    During this time, Argos suddenly stopped selling portland cement to Premier Concrete, denied Premier's credit application multiple times, and claimed

that it could not take on any more customers.  Argos continued to take on many other customers, however, while continuing to refuse to do business with Premier.

74.    The plaintiffs were not aware of the defendants' anticompetitive conduct until August 2017, when one of Premier Concrete's business neighbors who is in the concrete pipe industry showed Keith and Joy Woods a separate antitrust complaint against the defendants.[1]   The complaint was filed by Southeast Ready Mix and Mayson Concrete, and it alleged much of the same conduct that was inflicted upon Premier.

75.    Through the exclusion and systematic efforts to competitively disadvantage Premier Concrete and other nonparticipating competitors, ready-mix concrete consumers suffered supracompetitive prices, reduced quality products, and reduced choice among suppliers in the market:

a.    Ready mix consumers were overcharged as much as 20% during the relevant period.

b.    While competition was adequately suppressed, ready-mix consumers in the relevant markets, including nonparticipating competitors' customers such as Horizon Homes, Beacon Homes, V.B. Construction, and

---

[1] *Southeast Ready Mix, LLC v. Argos North America Corp.*, No.: 1:17-cv-02792 (N.D. Georgia).

Baca, purchased bad concrete ("G-crete") from Argos. Argos knew this concrete was inferior and inappropriate for use in construction. Customers, including residential homeowners, suffered construction defects and other consequences as a result.

## THE CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

76. Premier Concrete had no knowledge of the acts or conspiracies alleged in this complaint or of facts sufficient to place it on inquiry notice of the claims set forth in this complaint until, at the earliest, August 2017, when it learned of the conduct described in this complaint.

77. Premier Concrete could not have discovered the acts and conspiracies in either product market by any reasonable means prior to 2018. There was no information available to Premier in the public domain or otherwise prior to 2018.

78. For example, Argos has stated publicly and repeatedly that it has an antitrust compliance policy, including as part of its "Path of Sustainability" public report available on its website. It is reasonable to believe that Argos was enforcing this antitrust compliance policy. Similarly, Holcim's "Code of Business Conduct," also publicly available, states that "Holcim believes in free markets and fair competition" and that it does not violate antitrust laws because it is "never in Holcim's interest."

79.    Therefore, the statute of limitations for conduct occurring at least as early as 2009 did not begin to run until September 2018.

80.    Moreover, the statute of limitations is tolled by the doctrine of fraudulent concealment because all defendants concealed their illegal and anticompetitive conduct from its victims and the public.  Premier Concrete, other ready-mix suppliers, and the public had no knowledge of the acts and conspiracies alleged in this complaint, or of facts sufficient to place them on inquiry notice of their claims because the cartel fraudulently concealed its conduct.

81.    In an effort to further conceal their actions, the defendants misrepresented market conditions to explain price changes and other anticompetitive conditions.  For example, Argos falsely blamed changes in input costs for the price hikes and fuel surcharges in its price increase letters to cement and ready-mix concrete customers.

82.    The ready-mix cartel used Argos' Jim Pedrick as a conduit to pass information back and forth amongst one another and conceal the illegal competitor discussions.  As a cement salesman, Pedrick's discussions with Argos' ready-mix competitors would not raise red flags.  Pedrick told the others that, because it was not suspicious for a supplier to meet with customers, passing information through

him would protect them.   Specifically, Pedrick and other Argos' management rejected concerns raised by employees Tommy Waters and Hugh Papy.

83.   By their nature, the conspiracies were also inherently self-concealing. The antitrust laws apply in the cement and ready-mix industries, and thus Premier Concrete reasonably believed that these were competitive industries.   Premier Concrete could not have discovered the alleged conduct prior to September 2018 by reasonable diligence because of the deceptive practices employed by Argos and its co-conspirators to avoid detection and fraudulently conceal their conduct.

84.   Therefore, the statute of limitations applicable to Premier Concrete's claims was tolled until at least September 2018.

## COUNT I - READY MIX DEFENDANTS

## Joint Monopolization of the Ready Mix Concrete Market 15 U.S.C. § 2

85.   Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though fully set forth at length herein.

86.   Section 2 of the Sherman Act, 15 U.S.C. § 2 provides:

Every person who shall monopolize, or attempt  to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce  among the several States, or  with foreign nations,  shall be deemed  guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment

not exceeding 10 years, or by both said punishments, in the discretion
of the court.

87.    The defendants jointly possess monopoly power in the market for
ready-mix concrete in coastal Georgia and southeastern coastal South Carolina.
They have the power to exclude competition and raise prices.  Further, they have
exercised that power to exclude Premier Concrete from the market, harm
competition, and charge supra-competitive prices to consumers.

88.    Through the conduct described herein, the defendants willfully
maintained that monopoly power by anticompetitive and exclusionary conduct.
They acted in violation of Section 2 of the Sherman Act with the intent to maintain
this power, and the illegal conduct enabled them to do so.

89.    The anticompetitive conduct includes, but is not limited to:

    a.    **Predatory pricing.** By pricing below variable costs while
recouping those losses through Argos cement rebates, the ready-mix cartel
obtained, maintained, and protected their joint monopoly. Any losses from
predatory pricing would eventually be recouped by the supra-competitive
prices charged after they drove their targets from the market.

    b.    **Bid rigging.** By arranging bids and taking turns undercutting low
price competitors to spread the losses among the participating firms, the

ready-mix cartel obtained, maintained, and protected their joint monopoly. They were able to eliminate the competition in a war of attrition.

       **c.**     **Supra-competitive pricing.** Whenever possible, the ready-mix cartel raised prices to recoup their losses and profit off of dominating    the market.

       **d.**     **Reduction in quality.** Without disclosing to customers, Argos sold low quality concrete called "868" and "G-crete" that cost approximately $5 less per yard to make in order to undercut competitors and recoup losses.

       **e.**     **Monopoly leveraging.** The ready-mix cartel leveraged Argos' upstream monopoly in the market for portland cement to implement    this scheme.

90.    The market for ready mix concrete in coastal Georgia and southeastern coastal South Carolina has been harmed by the defendants' conduct. Consumers of ready-mix concrete have been forced to pay supra-competitive prices while receiving lower quality ready mix concrete. The defendants excluded Premier Concrete and other nonparticipating competitors through anticompetitive acts and could thus charge supra-competitive prices and offer a lower-quality product. For example:

       a.     Consumers were overcharged as much as 20%.

b.    The cartel sold consumers inferior products such as "868" concrete and "G-crete," leading to construction defects for hundreds of homes.

c.    Consumers had fewer choices in the market.

91.    Premier Concrete provided concrete superior to the concrete provided by the cartel members.   Premier has been harmed by the defendants' willful maintenance of their joint monopoly and their exclusion of lower priced competitors.

## COUNT II – READY MIX DEFENDANTS

## Attempted Monopolization of the Ready Mix Concrete Market 15 U.S.C. § 2

92.    Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

93.    The defendants willfully engaged in a course of conduct, including anticompetitive and exclusionary actions, with the specific intent of monopolizing the market for ready mix concrete in Statesboro, Savannah, and Bluffton/Hilton Head.   Anticompetitive conditions will occur in violation of Section 2 of the Sherman Act if the defendants are left unrestrained.

94.    The defendants took overt acts manifesting that intent, such as those described above.

95.    The market has been harmed by the defendants' conduct, as ready-mix concrete consumers have been forced to pay supra-competitive prices while receiving lower quality concrete.

96.    Premier Concrete provided quality ready-mix concrete that was superior to the ready-mix concrete provided by the cartel members.  Premier and other nonparticipating competitors have been harmed by the defendants' willful attempts to monopolize the market for ready-mix concrete and their exclusion of all price competitors.

## COUNT III – READY MIX DEFENDANTS

## Conspiracy to Monopolize the Ready Mix Concrete Market 15 U.S.C. § 2

97.    Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

98.    The defendants combined and conspired to acquire and maintain monopoly power in the markets for ready-mix concrete in Statesboro, Savannah, and Bluffton/Hilton Head.  They did so with the specific intent and purpose to exclude Premier Concrete and all other competition.

99.    The defendants took overt acts manifesting that intent, such as those described above.

48

100.   The defendants' concerted action entrenched their monopoly power.

101.   The defendants' conduct harmed the market by forcing ready-mix consumers to pay supra-competitive prices while receiving lower quality ready-mix concrete.

102.   Premier Concrete provided high quality ready-mix concrete at competitive prices, and was harmed by the defendants' willful maintenance of their monopoly and their exclusion of low price competitors.

## COUNT IV – READY MIX DEFENDANTS

**Conspiracy to Restrain Trade (Group Boycott) in the Ready Mix Concrete Market 15 U.S.C. § 1**

103.   Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

104.   Section 1 of the Sherman Act, 15 U.S.C. § 1, provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

105.   Argos, a horizontal competitor and vertical supplier of Premier Concrete, and Evans, Elite, Coastal, and Thomas (all competitors of both Southeast and Premier) combined and conspired to restrain trade in violation of Sherman Act Section 1 by engaging in a scheme to exclude Premier and other nonparticipating competitors from the market for ready mix concrete in Statesboro, Savannah, and Bluffton/Hilton Head in order to succeed in their price-fixing scheme.

106.   The defendants' agreement and actions in furtherance of the conspiracy foreclosed the ready-mix concrete market in relevant markets.

107.   The defendants' conduct has harmed the market by forcing ready-mix concrete consumers in the relevant markets to pay supra-competitive prices while receiving lower quality ready-mix concrete.

108.   Premier Concrete provided high quality ready-mix concrete at competitive prices and was harmed by the conspiracy.

## COUNT V – ARGOS

## Monopolization of the Cement Market 15 U.S.C. § 2

109.   Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though full set forth at length herein.

110.   Defendant Argos has market power in the portland cement market in coastal Georgia and southeastern coastal South Carolina.  It has the power to exclude competition and raise prices and has done so illegally.

111.   Argos willfully maintained that monopoly power by anticompetitive and exclusionary conduct.  This conduct included leveraging its monopoly power in the cement market to impose anticompetitive conditions for the ready-mix concrete market and in support of their conspiracy to fix prices in that market, including:

a.     Overcharging by as much as 50%.

b.     Competitive disadvantages and ultimately lost business/profits from rebates and credits Argos gave to concrete cartel members, as well as the sensitive business information Argos provided to cartel members.

112.   Argos' conduct has harmed the market as Premier Concrete and other cement purchasers have been forced to pay supra-competitive prices for cement.

113.   Premier Concrete and other nonparticipating competitors have been disadvantaged as competitors in the ready-mix concrete market through the leveraging described herein, and have been harmed by Argos' willful maintenance of its portland cement monopoly.

## COUNT VI – ARGOS

## Attempted Monopolization of the Cement Market 15 U.S.C. § 2

114.   Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

115.   Defendant Argos willfully engaged in anticompetitive and exclusionary actions, with the specific intent of monopolizing the market for portland cement in coastal Georgia and southeastern coastal South Carolina.   Unless its course of conduct is restrained, anticompetitive conditions will occur in violation of Section 2 of the Sherman Act.

116.   Argos took overt actions manifesting that intent, harming the market and forcing cement consumers to pay supra-competitive prices.

117.   Premier Concrete and other nonparticipating competitors have been harmed by Argos' willful attempts to monopolize the market for portland cement and their exclusion of all price competitors.

## COUNT VII – CEMENT DEFENDANTS

### Conspiracy to Restrain Trade (Price Fixing) in the Cement Market
### 15 U.S.C. § 1

118.   Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

119.   The defendants entered into a contract, combination, or conspiracy in unreasonable, *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act.

120.   Beginning as early as 2009, and continuing through the present, the cement cartel defendants entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade by artificially reducing or eliminating competition in coastal Georgia and southeastern coastal South Carolina.  The exact starting date is unknown to Premier Concrete and exclusively within the knowledge of the defendants.

121.   The cement cartel conspired to raise, fix, maintain, or stabilize the price of cement.  Prices were actually raised, fixed, maintained, and stabilized in coastal Georgia and southeastern coastal South Carolina as a result of this conduct.

122.   The cement cartel's conspiracy consisted of a continuing agreement, understanding, and concerted action among the members.

123.   Premier Concrete and other nonparticipating competitors have been injured in their business and property in that they have paid more for cement than they otherwise would have paid in the absence of the unlawful cement cartel.

## COUNT VIII – ALL DEFENDANTS

## Declaratory Judgment 28 U.S.C. § 2201

124.   Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

125.   An actual and justiciable controversy exists between Premier Concrete and the defendants concerning the defendants' violations of federal and state antitrust law.

126.   The defendants' actions and assertions described above have caused and will continue to cause irreparable harm to Premier Concrete and the public, and Premier has no adequate legal remedy.

127.   Premier Concrete seeks a declaration from this Court that the cement cartel defendants have attempted and maintained an illegal monopoly under Section 2 of the Sherman Act in the portland cement market.

128.   Premier Concrete also seeks a declaration from this Court that the cement cartel defendants engaged in a conspiracy to restrain trade under Section 1

of the Sherman Act in the market for portland cement, to the detriment of consumers and competition.

129.   Additionally, Premier Concrete seeks a declaration from this Court that the ready-mix cartel defendants have attempted and maintained an illegal joint monopoly under Section 2 of the Sherman Act in the market for ready mix concrete. Premier also seeks a declaration that the ready-mix cartel defendants conspired to restrain trade under Section 1 of the Sherman Act, to the detriment of consumers and competition.

## COUNT IX

## Restraint of Trade O.C.G.A. § 13-8-2

130.   Plaintiff Premier Concrete repeats each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

131.   The read- mix cartel defendants conspired to restrain trade in violation of Georgia law by engaging in a scheme to exclude Premier Concrete and other low price leaders from the ready-mix concrete market in coastal Georgia and southeastern coastal South Carolina in order to fix prices.

132.   Argos, Cemex, Holcim conspired to restrain trade in violation of Georgia law by agreeing to monopolize and to fix prices in the portland cement market in coastal Georgia and southeastern coastal South Carolina.

133.   The defendants' agreement and actions in furtherance of the conspiracy excluded Premier Concrete and other competitors from the ready-mix concrete and portland cement markets in coastal Georgia and southeastern coastal South Carolina.

134.   The defendants' conduct has harmed the market by forcing ready mix concrete consumers in southeast Georgia to pay supra-competitive prices while receiving lower quality ready mix concrete.

## COUNT X – READY MIX DEFENDANTS

## Tortious Interference with Business Relations Georgia Common Law

135.   Plaintiff Premier Concrete repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

136.   The defendants acted improperly and without privilege to interfere with Premier Concrete's business relationships with suppliers and customers.   For example, Giant refused to do business with certain companies that had a relationship with Premier.

137.   The defendants' interference was purposeful and with malice and was specifically intended to harm Premier Concrete, and their conduct induced customers and suppliers to not enter into or continue a business relationship with Premier.  Absent the interference, Premier's business relationships were reasonably likely to continue or to develop into additional business.

138.   The defendants' conduct was the proximate cause of Premier Concrete's financial harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Premier Concrete requests that this Court:

A.      Enter a temporary restraining order against defendants to enjoin them from continuing their illegal acts;

B.      Declare that the defendants' conduct violates 15 U.S.C. §§ 1-2 and Georgia state law;

C.      Enter judgment against the defendants;

D.      Award Premier Concrete treble damages;

E.      Award Premier Concrete pre- and post-judgment interest at the applicable rates on all amounts awarded;

F.      Award Premier Concrete its costs and expenses of this action, including its reasonable attorneys' fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. §§ 15 and 26;

G.      Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in this complaint; and

H.      Order any other such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims.

Submitted this 22nd day of January, 2020.

/s/ Benjamin R. Keen
Benjamin R. Keen (GA Bar No. 810828)
C. Lance Gould (to be admitted pro hac vice)
Tyner D. Helms (to be admitted pro hac vice)
BEASLEY, ALLEN, CROW,
  METHVIN, PORTIS & MILES, P.C.
4200 Northside Parkway NW
Building One, Suite 100
Atlanta, Georgia  30327
Tel: (404) 751-1162
Fax: (855) 674-1818
Ben.Keen@BeasleyAllen.com
Lance.Gould@BeasleyAllen.com
Tyner.Helms@BeasleyAllen.com

Theodore T. Carellas (to be admitted pro hac vice)
Carellas Law Firm
440 Silverwood Centre Drive
Post Office Box 2599
Rincon, Georgia  31326
TCarellas@carellaslaw.com

*Attorneys for Plaintiffs*