IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PREMIER CONCRETE LLC, KEITH WOODS,
and JOY WOODS,

　　Plaintiffs,

　　　　　　v.

ARGOS NORTH AMERICA CORP., *et al.*,

　　Defendants.

Civil Action No.
1:20-cv-00307-SDG

## <u>OPINION AND ORDER</u>

Antitrust laws "are designed to protect the consumer interest in competition."[1] Here, Plaintiffs initiated this antitrust lawsuit against fifteen Defendants for operating two separate "cartels" in the markets for cement and for ready-mix concrete in the coastal areas of Georgia and South Carolina. Cement is the central ingredient in ready-mix concrete. Defendants purportedly used the cartels to exclude Plaintiffs from the ready-mix market, steal their customers, and undercut them on price. The conspiracies allegedly started in 2009, but Plaintiffs did not initiate suit until January 2020. All Defendants moved to dismiss on various grounds.[2] These motions are now fully briefed and ripe for consideration.

---

[1]　*Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 721 (11th Cir. 1984) (per curiam) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)).

[2]　ECF 92; ECF 94; ECF 95; ECF 97; ECF 98; ECF 100; ECF 102.

# I.   Background

## A.   Factual History[3]

The Complaint asserts that there are two separate, but related, cartels operating in coastal Georgia and southeast coastal South Carolina.[4] The first—the "Cement Cartel"—is comprised of the Argos Defendants; Holcim (US) Inc.; Giant Cement Company; and the Cemex Defendants (collectively, the Cement Defendants).[5] The Cement Defendants are horizonal competitors and allegedly agreed to fix cement prices and monopolize the regional market.[6]

The second cartel—the "Ready-Mix Cartel"—was formed by the Argos, Elite, Evans, and Thomas Defendants (collectively with Defendant Coastal

---

[3]   For purposes of this Order, the Court treats the well-pleaded allegations of the Complaint as true. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 (11th Cir. 1999) ("At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.").

[4]   ECF 1, ¶ 1.

[5]   *Id.* ¶ 2.

The Argos Defendants are Argos North America Corp. and Argos Ready Mix, LLC; the Cemex Defendants are Cemex, Inc.; Cemex Materials, LLC; and Cemex Southeast, LLC.

[6]   *Id.*

A horizontal restraint of trade is defined as one that is "imposed by agreement between competitors at the same level of distribution." Restraint of Trade, *horizontal restraint*, BLACK'S LAW DICTIONARY (11th ed. 2019).

Concrete Southeast II LLC, the Ready-Mix Defendants).[7] These Defendants are also horizontal competitors and allegedly engaged in various anticompetitive activities for the purpose of fixing, raising, and stabilizing the price of ready-mix concrete.[8] Because Plaintiff Premier Concrete LLC (Premier) refused to participate in this cartel, it was subject to a group boycott.[9] The members of the Ready-Mix Cartel had a combined market share of 80% at all relevant times.[10]

---

[7]   *Id.* ¶ 3.

The Elite Defendants are Elite Concrete, LLC; Elite Concrete Holdings, LLC; and Elite Concrete of SC, LLC. The Evans Defendants are Evans Concrete Holdings, Inc. and Evans Concrete, LLC. The Thomas Defendants are Thomas Concrete, Inc.; Thomas Concrete of Georgia, Inc.; and Thomas Concrete of South Carolina, Inc.

Although Defendant Coastal Concrete Southeast II LLC (Coastal) is purportedly a ready-mix concrete company, *id.* ¶ 22, the Complaint sometimes includes and sometimes omits it as a member of the Ready-Mix Cartel. *Compare id.* ¶ 3 *with id.* ¶ 29. For purposes of this Order, the Court treats Coastal and the Thomas Defendants as separate alleged members of the Ready-Mix Cartel.

Although the Complaint indicates Coastal Concrete Company, Inc. is a defendant, this is not accurate. No summons was issued to it and it does not appear to have ever been served with process. According to the Complaint it was purportedly acquired by one of the Thomas Defendants in 2015. *Id.* ¶ 22. This discrepancy is immaterial for purposes of this Order.

[8]   *Id.* ¶ 3.

[9]   *Id.*, Count IV.

[10]   *Id.* ¶ 29.

According to Plaintiffs, the members of both cartels have conspired since at least 2009 to fix prices.[11] Since cement is the central ingredient of ready-mix concrete, the Argos Defendants are allegedly able to use their dominant position in the cement market to further the interests of the Ready-Mix Cartel.[12] In so doing, the Ready-Mix Cartel is able to keep new competitors out of the industry or run them out of business if they succeed in starting up.[13]

Premier was in the ready-mix concrete business, supplying concrete for residential and commercial projects in southeast Georgia and coastal South Carolina.[14] Plaintiffs Keith and Joy Woods own Premier, but sold all of its operational assets in January 2019.[15] Plaintiffs assert that Premier was a target of the Ready-Mix Cartel.[16] The cartel members allegedly engaged in assorted predatory conduct, including tailing Premier's trucks to job sites and then undercutting Premier's pricing to those customers.[17] The Argos Defendants

---

[11] *Id.* ¶ 5.

[12] *Id.* ¶¶ 7–11.

[13] *See, e.g., id.* ¶¶ 7, 11, 47.

[14] *Id.* ¶ 18.

[15] *Id.*

[16] *Id.* ¶¶ 32, 35.

[17] *Id.* ¶¶ 35, 35.f.

purportedly undercut Premier's pricing shortly before it was scheduled to pour a concrete job, while at the same time refusing to sell Premier the cement necessary to create the concrete.[18]

Because Premier refused to join the Ready-Mix Cartel, it was allegedly charged supra-competitive prices for cement.[19] It lost money from 2009 through 2013 because of Defendants' anti-competitive conduct; the Woods, however, assert that they did not understand the nature of this conduct at the time.[20] Plaintiffs also allege that they did not have inquiry notice of Defendants' illicit conduct until August 2017, and could not have discovered the conspiracies before September 2018.[21] Plaintiffs contend that Defendants actively worked to conceal their behavior from their victims and the public, and that Defendants' conduct was "self-concealing."[22]

---

[18]   *Id.* ¶¶ 72–73.

[19]   *Id.* ¶ 65.

[20]   *Id.* ¶¶ 68–69.

[21]   *Id.* ¶¶ 74, 76–79.

[22]   *Id.* ¶¶ 80–81, 83.

**B.**     **Procedural History**

Plaintiffs filed suit on January 22, 2020.[23] As to the Ready-Mix Defendants, Plaintiffs allege violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, because of the cartel's "joint monopolization" of the ready-mix concrete market, which was maintained through anticompetitive and exclusionary conduct (Count I). Plaintiffs also assert causes of action against the Ready-Mix Defendants for attempted monopolization in violation of Section 2 (Count II); conspiracy to monopolize in violation of Section 2 (Count III); conspiracy to restrain trade (group boycott) in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count IV); and tortious interference with business relations under Georgia common law (Count X). Plaintiffs assert causes of action against the Argos Defendants for monopolization and attempted monopolization of the cement market in violation of Section 2 (Counts V and VI). As to the Cement Defendants, Plaintiffs allege a violation of Section 1 for conspiracy to restrain trade through price fixing (Count VII). Count IX for restraint of trade in violation of O.C.G.A. § 13-8-2 appears to be asserted against all Defendants.

---

[23]    *See generally* ECF 1.

Plaintiffs contend that they lost profits and suffered other damages as a result of Defendants' conduct, and were forced to sell the business for less than they would have absent the illicit behavior.[24] They seek a declaratory judgment that the Cement Defendants attempted to and did maintain an illegal monopoly and engaged in a conspiracy to restrain trade, and that the Ready-Mix Defendants attempted to and did maintain an illegal joint monopoly (Count VIII). Plaintiffs also seek treble damages; attorneys' fees and expenses; and permanent injunctive relief.[25] All Defendants moved to dismiss, asserting various theories such as the running of the statute of limitations and failure to state a claim under Rule 12(b)(6).[26] Plaintiffs filed opposition briefs,[27] and Defendants replied.[28]

---

[24]   *Id.* ¶ 13.

[25]   *Id.* at 57–58.

Although the Complaint's *ad damnum* clause seeks a temporary restraining order against Defendants, *id.* at 57 ¶ A, Plaintiffs have not filed a separate motion seeking such relief.

[26]   ECF 92; ECF 94; ECF 95; ECF 98; ECF 100; ECF 102.

The Ready-Mix Defendants, along with Holcim filed a joint motion to dismiss (the Joint Motion). ECF 97.

[27]   ECF 130 through ECF 136.

[28]   ECF 141 through ECF 146.

## II.     Pleading Standard

Federal Rule of Civil Procedure 8(a)(2) requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), "a complaint must now contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570).

A complaint is plausible on its face when a plaintiff pleads sufficient factual content for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. *Am. Dental Ass'n,* 605 F.3d at 1289 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Although the Court must accept all well-pleaded facts as true, it "need not accept inferences drawn by plaintiff if such inferences are unsupported by the facts set out in the complaint" or "accept legal conclusions cast in the form

of factual allegations." *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1358 (N.D. Ga. 2010) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). *See also Iqbal*, 556 U.S. at 678 (court need not accept legal conclusions in pleading); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1079 (11th Cir. 2004) (noting that "conclusory allegations, unsupported by specific factual allegations, do not state a claim for relief under the antitrust laws").

## III.   Discussion

### A.      The Woods lack standing to assert their antitrust claims.

Plaintiffs Keith and Joy Woods owned Premier.[29] In January 2019, they sold all of its "operational assets" to non-party Smyrna Ready Mix.[30] Plaintiffs allege that they "have suffered lost profits and other damages resulting from the cartel's conduct" and that Premier lost value.[31] They contend that Keith Woods had to "ramp up" another business to keep Premier afloat because of the cartels' conduct.[32] All Defendants argue that the Woods lack standing to sue.[33] For

---

[29]   ECF 1, ¶¶ 18–19.

[30]   *Id.*

[31]   *Id.* ¶ 13.

[32]   *Id.* ¶ 70.

[33]   ECF 95-1, at 8; ECF 97-1, at 35–37; ECF 102-1, at 24.

example, the Joint Motion asserts that the Complaint fails to allege that either Keith or Joy Woods was a "customer or a competitor in either the ready-mix or cement markets in which competition was allegedly harmed."[34] Plaintiffs respond that the Woods "were in *essence* competitors of Defendants" because they owned Premier.[35]

Article III of the Constitution limits federal courts to consideration of cases and controversies. U.S. Const. art. III, § 2. The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In addition to the Article III "case or controversy" requirement, an antitrust plaintiff must also demonstrate antitrust standing. *Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997); *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). "Antitrust standing is best understood in a general sense as a search for the proper plaintiff to enforce the antitrust laws." *Todorov*, 921 F.2d at 1448 (citation omitted). Antitrust standing therefore "involves more than the 'case or controversy' requirement that drives constitutional standing." *Id.* (citing *Flast v. Cohen,* 392 U.S. 83, 94–101 (1986)). This is to prevent overdeterrence resulting from the threat of treble damages. *Id.* at 1449.

---

[34]   ECF 97-1, at 35–36.

[35]   ECF 130, at 27 (emphasis added). *See also* ECF 131, at 13.

To determine whether a plaintiff has antitrust standing, the Court must first analyze whether that person has suffered an "antitrust injury"—that is, the type of injury antitrust laws were intended to prevent. *Fla. Seed Co.*, 105 F.3d at 1374; *Todorov*, 921 F.2d at 1449. Standing is a question of law. *Fla. Seed Co.*, 105 F.3d at 1374; *Todorov*, 921 F.2d at 1448. "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Todorov*, 921 F.2d at 1449 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Second, the Court must assess whether that person is an "efficient enforcer of the antitrust laws." *Id.*

Here, there are no allegations in the Complaint that either of the Woods suffered any type of injury—antitrust or otherwise—as a result of Defendants' conduct. Each cause of action asserts only that Premier was harmed by Defendants.[36] Even the prayer for relief is only on behalf of Premier.[37] Plaintiffs argue that, as the owners of Premier, the Woods were directly injured, but cite no case law in support of this theory.[38] Nor are there any allegations in the Complaint that *the Woods* were the target of Defendants' alleged conspiracies. To have an

---

[36]   ECF 1, ¶¶ 91, 96, 102, 108, 113, 117, 123, 125, 131, 133, 136–38.

[37]   *Id.* at 57–58.

[38]   ECF 130, at 27.

antitrust injury, the plaintiff "must be one against whom anticompetitive activity is directed, and not one who has merely suffered indirect, secondary, or remote injury." *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 710 (11th Cir. 1984) (per curiam) (citing *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir. 1975)). *See also Nat'l Independent Theatre Exhibitors, Inc. v. Buena Vista Distrib. Co.*, 748 F.2d 602, 608 (11th Cir. 1984) ("The plaintiff must be the target against which anticompetitive activity is directed.") (citations omitted). It is clear from the Complaint that Defendants' purported conduct was not directed at any individual, much less that it was specifically directed at the Woods.[39]

The Woods's status as the owners of Premier does not imbue them with antitrust standing. In *Florida Seed Co. v. Monsanto Co.*, the Eleventh Circuit held that the sole shareholder of a company that had its distributorship agreement terminated after a merger of two of its suppliers was "not a customer or competitor in any relevant market." 105 F.3d at 1375. The shareholder had not suffered an antitrust injury: "Courts uniformly have held that stockholders, even sole stockholders . . . lack standing to bring an antitrust suit for injury to their corporations." *Id.* at 1376 (citations omitted). *See also Nat'l Independent Theatre*

---

[39]   *See generally* ECF 1.

*Exhibitors*, 748 F.2d at 608 (holding that officer/shareholder of target company of alleged conspiracy did not have standing because he had not suffered an antitrust injury); *Midwestern Waffles*, 734 F.2d at 711–12 (holding that plaintiff shareholder of company pressing antitrust violations did not have standing, despite allegations that he lost opportunities and incurred expenses because of defendants' antitrust conduct). Put another way, "[t]he law on standing in this situation is clear. Neither an officer nor an employee of a corporation has standing to bring an action in his own right for an antitrust violation causing injury to the corporation and its business." *Nat'l Independent Theatre Exhibitors*, 748 F.2d at 608 (citations omitted). While "[s]uch persons may suffer 'indirect' or 'secondary' financial injury from antitrust violations, [ ] they are not the target of the anticompetitive practices." *Id.* at 608 (citation omitted).

Therefore, the Woods do not have standing to assert claims against Defendants. They are **DISMISSED** from this action.

**B.    Premier's Sherman Act claims are barred by the statute of limitations (Counts I through VII).**

All Defendants assert a statute of limitations defense.[40] Under the Clayton Act, the statute of limitations applicable to civil claims under Sections 1 and 2 of the Sherman Act is four years. 15 U.S.C. § 15b.

> Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business. . . . In the context of a continuing conspiracy to violate the antitrust laws . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) (citations omitted). Thus, "a plaintiff must file [a] claim within four years following defendant's injurious act." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 827 (11th Cir. 1999) (citing 15 U.S.C. § 15(b)).

The statute of limitations is an affirmative defense. Fed. R. Civ. P. 8(c)(1). Generally, the existence of such an affirmative defense "will not support a motion to dismiss." *Quiller v. Barclay's Am./Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984)

---

[40]    *See generally* ECF 94-1; ECF 95-1, at 26–28; ECF 97-1, at 37–43; ECF 98, at 3–5; ECF 102, at 28–29. The Argos, Elite, Evans, and Thomas Defendants, as well as Coastal, also adopt and incorporate by reference the limitations argument raised in Holcim's separate brief (ECF 94-1). ECF 97-1, at 29 n.44.

(citations omitted). "Nevertheless, a complaint may be dismissed under Rule 12(b)(6) when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint." *Id.* When this is the case, the pleading "has a built-in defense and is essentially self-defeating. The problem is not that plaintiff merely has anticipated and tried to negate a defense he believes his opponent will attempt to use against him; rather plaintiff's own allegations show that the defense exists." *Quiller*, 727 F.2d at 1069 (cleaned up). Thus, if the limitations defense is clear from the face of the Complaint, Premier cannot recover for any acts that injured it more than four years before the case was started—*i.e.*, January 22, 2016—unless there is some basis for tolling. *Morton's Mkt.*, 198 F.3d at 827, 828 n.2, 832. *See also Gonsalvez v. Celebrity Cruises Inc.*, 750 F.3d 1195, 1197 (11th Cir. 2013) (per curiam).

Although raised at varying points in separate motions, all Defendants argue that Premier's claims are time-barred and that it has failed to plead fraudulent concealment with sufficient particularity sufficient to establish equitable tolling.[41] Premier responds that its price-fixing allegations constitute conduct that can be

---

[41]   ECF 97-1, at 37–43. *See also* ECF 94-1, at 9–14; ECF 95-1, at 26–28; ECF 102, at 28–29.

self-concealing and that it has alleged affirmative acts undertaken by Defendants to hide their misconduct.[42]

### 1. Premier fails to allege it suffered an injury within four years before it initiated this action.

As a threshold matter, the Complaint alleges that Premier was harmed from 2009 through 2013.[43] Although the Complaint alleges antitrust violations by the Ready-Mix Cartel after that point, it does not suggest that Premier suffered any injury as a result.[44] Similarly, Premier does not allege that it suffered any injury after 2013 because of the Cement Cartel.[45] Since the face of the Complaint makes clear that Premier was last injured more than four years before the Complaint was filed, its claims are time-barred absent some exception. 15 U.S.C. § 15(b); *Morton's Mkt.*, 198 F.3d at 827; *Quiller*, 727 F.2d at 1069.

### 2. Premier fails to plausibly allege an injury sufficient to establish a cause of action for a continuing antitrust conspiracy.

For an "alleged continuing conspiracy to violate antitrust laws, a new cause of action accrues after the defendant commits (1) an overt act in furtherance of the

---

[42]  ECF 130, at 24–27.

[43]  *See generally* ECF 1, ¶¶ 67–70.

[44]  *Id.* ¶¶ 65–75.

[45]  *Id.* ¶¶ 67–70.

antitrust conspiracy or (2) an act that by its very nature constitutes a continuing antitrust violation." *Bray v. Bank of Am. Corp.*, 784 F. App'x 738, 741 (11th Cir. 2019) (cleaned up) (citing *Morton's Mkt.*, 198 F.3d at 827–28). An overt act includes, for instance, a plaintiff purchasing a good the price of which was set through price fixing. *Morton's Mkt.*, 198 F.3d at 828. A new cause of action would accrue with each purchase, and the statute of limitations would start to run from that accrual. *Id.* The cause of action must be based on an injury to the plaintiff that occurs during the limitations period. *Bray*, 784 F. App'x at 741.

Premier, however, fails to allege that it suffered any actual harm during the limitations period. Nor has Premier timely alleged a "continuing violation" of the antitrust laws that caused it injuries over a period of time. *Morton's Mkt.*, 198 F.3d at 828. By causing "continuing and accumulating harm," an antitrust violation occurs each time a plaintiff is injured by that act. *Id.* (cleaned up). The Supreme Court has described an example of a continuing violation as:

> [A] price–fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (cleaned up).

To avail itself of the "continuing violation" rule, Premier must identify "some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Bray*, 784 F. App'x at 741 (cleaned up). Reading the pleading in a light most favorable to Premier, the Complaint alleges that the Ready-Mix Cartel engaged in price-fixing efforts.[46] Similarly, the pleading contains allegations that the Cement Cartel worked to make it difficult or impossible for companies that did not participate in the Ready-Mix Cartel to obtain materials necessary to make concrete.[47] The Cement Cartel also allegedly engaged in price-fixing.[48] However, none of these acts are alleged to have caused Premier injury during the limitations period.

A price-fixing conspiracy that occurred outside of a limitations period could cause injury to a plaintiff *within* a limitations period if the plaintiff continued to be subject to the "unlawfully high priced sales" during that time. *Morton's Mkt.*, 198 F.3d at 828. But Premier has failed to identify any sales to it or other injury within four years of filing the Complaint. There is no allegation that Premier made any

---

[46]   *Id.* ¶¶ 6–11.

[47]   *Id.* ¶¶ 31.e., 35.b., 35.k., 35.*l.*, 35.n.

[48]   *Id.* ¶¶ 31.f., 35.e., 35.j., 35.n., 48.

purchase after 2013 of any product for which the price was artificially affected because of the Ready-Mix Cartel's or the Cement Cartel's purported price-fixing. It likewise does not assert any harm from the alleged group boycott. In fact Premier does not allege any injury at all after 2013.[49] Even if Premier had made such allegations, it could not use them "as a bootstrap to recover for injuries caused by other earlier [ ] acts that took place outside the limitations period." *Klehr*, 521 U.S. at 190. Because the Complaint lacks the necessary allegations to support a continuing antitrust violation, this avenue is foreclosed to Premier.

### 3.   Premier fails to plausibly allege fraudulent concealment necessary to equitably toll the statute of limitations.

Fraudulent concealment of conduct in violation of the antitrust laws can equitably toll the statute of limitations during the period of concealment. *Morton's Mkt.*, 198 F.3d at 832; *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1169 (5th Cir. 1979)).

> To avail themselves of this doctrine, plaintiffs have the burden of proving at trial that [1] "the defendants concealed the conduct complained of, and [2] that [plaintiffs] failed, despite the exercise of due diligence on [their] part, to discover the facts that form the basis of [their] claim."

---

49   *Id.* ¶¶ 67–70.

*Morton's Mkt.*, 198 F.3d at 832 (quoting *In re Beef*, 600 F.2d at 1169) (alterations in original). *See also Klehr*, 521 U.S. at 182 ("[A] plaintiff may not rely upon 'fraudulent concealment' unless he has been reasonably diligent in trying to discover his cause of action.").

Where fraudulent concealment exists, "plaintiffs may recover damages for all the years during which the conspiracy was fraudulently concealed and the statute was tolled." *Morton's Mkt.*, 198 F.3d at 832 (citing *In re Beef*, 600 F.2d at 1169). Allegations of fraudulent concealment, however, must be pleaded with particularity. Fed. R. Civ. P. 9(b); *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 970–71 (5th Cir. Unit B Dec. 1981);[50] *Von Der Werth v. Johns Manville*, Civ. A. No. 1:07-cv-2012-JEC, 2009 WL 10669723, at *3 n.4 (N.D. Ga. Mar. 23, 2009). The Complaint must allege:

    (1)    precisely what statements were made in what documents or oral representations or what omissions were made, and

    (2)    the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and

    (3)    the content of such statements and the manner in which they misled the plaintiff, and

---

[50]  Cases decided by Unit B of the Former Fifth Circuit are binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

> (4)    what the defendants obtained as a consequence of
> the fraud.

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)

(cleaned up). *See also Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir.

2006) ("This means the who, what, when, where, and how: the first paragraph of

any newspaper story."). The Court therefore rejects Premier's suggestion that it

should apply a "more relaxed" pleading standard to its fraudulent concealment

allegations.[51]

    Premier argues it has alleged both (1) affirmative acts of concealment and

(2) that the price-fixing activities of both cartels were inherently "self-

concealing."[52] For immediate purposes, the Court assumes (as Premier argues)

that actions undertaken by one member of a cartel to conceal the cartel's activities

would serve to toll the limitations period as to all Defendants alleged to be

members of that particular cartel.[53]

---

[51]  ECF 130, at 25 (citing *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751 (E.D. Mich. 2017)).

[52]  *Id.* at 24–27.

[53]  *Id.* at 26–27.

### i.  Active concealment

Outside of the antitrust context, the Eleventh Circuit has indicated that "[e]quitable tolling by concealment is established either through affirmative actions by the defendant constituting concealment or where the wrong is of such a character as to be self-concealing." *Foudy v. Indian River Cnty. Sheriff's Off.*, 845 F.3d 1117, 1124 (11th Cir. 2017) (citing *Hill v. Texaco, Inc.*, 825 F.2d 333, 335, 335 n.2 (11th Cir. 1987)). Although Premier argues that the Complaint "specified multiple occasions where Defendants acted with other Defendants to conceal their illegal and anticompetitive conduct from the public," it does not cite any specific portion of the pleading in support.[54] Rather, Premier relies on the bare assertion that "Defendants misrepresented market conditions to explain price changes and other anticompetitive conditions."[55] But the issue is not whether Defendants' conduct was concealed from the public. What matters is whether it was concealed from *Premier*. And it is here that the Complaint fails to particularize its allegations.

Presumably as an example of active concealment, the Complaint states that the Argos Defendants "falsely blamed changes in input costs for the price hikes and fuel surcharges in [ ] price increase letters to cement and ready-mix concrete

---

[54]  *Id.* at 26.

[55]  *Id.*

customers."[56] However, there is no allegation that such allegedly false statements were made to Premier. The only other allegations in the Complaint that attempt to explain Defendants' active concealment are Premier's cursory mention of the existence of the Argos Defendants' antitrust compliance policy and Holcim's code of business conduct.[57] These policies were purportedly why Premier "could not have discovered the acts and conspiracies in either product market by any reasonable means prior to 2018."[58] There are, however, no allegations about when Premier saw these policies, how those policies served to conceal the misconduct, or what caused Premier to discover the illicit acts in 2018. *Brooks*, 116 F.3d at 1371.

Moreover, construing the Complaint to allege these as acts of active concealment directly conflicts with Premier's group boycott cause of action against the Ready-Mix Defendants. If the group boycott was in retaliation for Premier's refusal to join the cartel, it is unclear how Premier *would not* have known about the cartel and its alleged price-fixing scheme. The alleged harm to Premier (*i.e.*, the boycott) would have been an immediate and apparent consequence of it having

---

[56]   ECF 1, ¶ 81.

[57]   *Id.* ¶ 78.

[58]   *Id.* ¶ 77.

declined to participate in the illicit agreement. Thus, as currently pled, Premier has no viable argument regarding active concealment.

Certain Defendants argue that the Complaint must allege that they specifically made fraudulent statements designed to conceal their conduct.[59] Given the nature of conspiracies, the Court is not persuaded that each defendant must have made fraudulent statements to conceal the conspiracy in order for tolling to apply to the claims against it—if the pleading particularizes how that defendant actively benefited from the concealment efforts of other members of the cartel of which that defendant was a member.[60] *See Brooks*, 116 F.3d at 1381 (noting that, in cases involving multiple defendants, Rule 9(b) requires a plaintiff to inform each defendant of its role in the fraud); *Summer*, 664 F.2d at 968–71 (concluding, in securities fraud action, that complaint failed to satisfy Rule 9(b) with regard to allegations of fraudulent concealment by underwriter and accounting firm where those allegations were conclusory; separate allegations as to differently situated corporate defendants were sufficient). Such allegations must, however, be pleaded with particularity. *Summer*, 664 F.2d at 970–71.

---

[59] *See, e.g.*, ECF 94-1, at 10–12; ECF 98, at 4.

[60] *See, e.g.*, ECF 136, at 13–14.

### ii.   Self-concealing

Premier's primary argument in support of tolling is that the conspiracies were "inherently self-concealing."[61] According to the Eleventh Circuit, a "self-concealing wrong is one in which the clandestine nature of the activity is essential to the act itself, where a deception, misrepresentation, trick or contrivance is a necessary step in carrying out the illegal act, not merely separate from the illegal act and intended only to cover up the act." *Foudy*, 845 F.3d at 1125. *See also Von Der Werth*, 2009 WL 10669723, at *3 (describing self-concealing conduct as the kind in which "the concealment is inherent in the nature of the wrong done"). Premier suggests that, because antitrust conspiracies are designed to be kept secret in order for them to work, they are therefore self-concealing.

In support of this argument, Premier relies on cases from other jurisdictions.[62] But as another federal court has noted, only the Second Circuit has adopted this expansive view of the self-concealing doctrine. *In re Pork Antitrust Litig.*, 2020 WL 6149666, at *7 (D. Minn. Oct. 20, 2020). *See, e.g., New York v.*

---

[61]   ECF 1, ¶ 83; ECF 130, at 24–25.

[62]   ECF 130, at 24–25 (citing *King & King Enters. v. Champlin Petro. Co.*, 657 F.2d 1147, 1155 (10th Cir. 1981); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 399 (S.D.N.Y. 2010); *In re Nine West Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 192–93 (S.D.N.Y. 2000)).

*Hendrickson Bros.*, 840 F.2d 1065, 1068 (2d Cir. 1988) (finding that bid-rigging and price-fixing conspiracies are inherently self-concealing). Every other federal appellate court to consider the issue has found that, to toll the statute of limitations, there must be allegations that the defendants performed affirmative acts to conceal the alleged conspiracy. *E.g., In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008); *In re Fasteners Antitrust Litig.*, No. CIV.A. 08-MD-1912, 2011 WL 3563989, at *3 (E.D. Pa. Aug. 12, 2011) (collecting cases from the Fourth, Fifth, and Tenth Circuits).

The Eleventh Circuit has not addressed this question in the antitrust context. However, a securities fraud opinion from that court suggests allegations of self-concealing conspiracies might be a viable means of establishing equitable tolling. *E.g., Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1535 n.28 (11th Cir. 1987). No court in this district has extensively discussed the issue, although two courts briefly considered it at the pleading stage. *Southeast Ready Mix, LLC v. Argos N. Am. Corp.*, No. 1:17-cv-02792-ELR, 2018 WL 8263138, at *13 (N.D. Ga. Aug. 22, 2018) (the *SE Ready Mix Litigation*); *Von Der Werth*, 2009 WL 10669723, at *3. Based on the approach taken by a majority of federal courts, this Court is skeptical that self-concealment is a viable method of establishing equitable tolling—at least absent factual allegations demonstrating affirmative acts of concealment. *In re Pork,* 2020

WL 6149666, at *7 ("To hold that fraudulent concealment can be met by claiming a conspiracy is self-concealing would mean allowing fraudulent concealment to apply to nearly every conspiracy.").

Even assuming that (1) certain conduct in violation of the Sherman Act can be self-concealing sufficient to support tolling and (2) at least some of the alleged activities engaged in by Defendants fall into this category, Premier's arguments here suffer from the same defects as its active concealment arguments. For example, Premier's allegations are facially contradictory; it is not factually plausible that the Ready-Mix Defendants could have attempted (but failed) to recruit Premier into their conspiracy—as alleged in Count IV's group boycott cause of action—without Premier actually knowing about the conspiracy or price fixing scheme. Based on Premier's own allegations, it should have known (1) that it was being boycotted and (2) the reason for the boycott. There are no details in the Complaint that plausibly demonstrate Premier's purported lack of knowledge given the bases for its substantive causes of action.

### iii. Due diligence

Moreover, even if the Court provided the benefit of assuming certain of Defendants' alleged conduct was self-concealing, Premier has not sufficiently pleaded that it exercised due diligence to discover the facts that form the basis of

its claims. "[A] plaintiff may not rely upon 'fraudulent concealment' unless he has been reasonably diligent in trying to discover his cause of action." *Klehr*, 521 U.S. at 182. *See also Morton's Mkt.*, 198 F.3d at 832; *In re Beef*, 600 F.2d at 1169. *See also In re Eur. Gov't Bonds Antitrust Litig.*, No. 19 CIV. 2601 (VM), 2020 WL 4273811, at *11 (S.D.N.Y. July 23, 2020) ("[A] conspiracy's self-concealing nature alone cannot excuse a plaintiff's failure to plead any exercise of due diligence at all."). An objective standard is applied to determine whether a plaintiff was on inquiry notice; the plaintiff is charged with knowledge of its claims when it should have discovered the basis for them. *Morton's Mkt.*, 198 F.3d at 835.

Generally, whether a plaintiff exercised due diligence is an issue of fact. *Morton's Mkt.*, 198 F.3d at 832. A lack of due diligence, however, may be evident from the face of the complaint. *Gonsalvez*, 750 F.3d at 1197 ("A Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate 'if it is apparent from the face of the complaint that the claim is time-barred.'") (citing *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)) (similar); *Summer*, 664 F.2d at 970–71 (affirming dismissal of complaint as to certain defendants for failure to plead fraudulent concealment with particularity). Here, Premier's own allegations fail to plausibly state that it exercised due diligence. Premier acknowledges that it was put on inquiry knowledge of its claims at least as early as August 2017:

> [O]ne of Premier Concrete's business neighbors who is in
> the concrete pipe industry showed the Woods a separate
> antitrust complaint against the defendants. The
> complaint was filed by Southeast Ready Mix and
> Mayson Concrete, and it alleged much of the same
> conduct that was inflicted upon Premier.[63]

Despite that concession, Premier repeatedly asserts that it could not have discovered Defendants' misconduct "by any reasonable means" prior to 2018 and that the statute of limitations did not begin to run until September 2018.[64] The *SE Ready Mix Litigation* complaint the Woods saw in August 2017 had been publicly filed the month before.[65] That complaint contains allegations remarkably similar to those in Plaintiffs' own pleading, including the exact same causes of action in the same order—a fact Premier acknowledges.[66] *Morton's Mkt.*, 198 F.3d at 833 ("Notice that the [defendants] were rigging bids to one customer, then, supplies notice that they might be rigging bids to you and triggers a duty to inquire."); *In re Beef*, 600 F.2d at 1170–71 ("In a case involving a claim that the statute of

---

[63]  ECF 1, ¶ 74 (footnote omitted) (citing *Se. Ready Mix, LLC v. Argos N. Am. Corp.*, No. 1:17-cv-02792-ELR (N.D. Ga.) (the *SE Ready Mix Litigation*)).

[64]  *Id.* ¶¶ 77–84.

[65]  *SE Ready Mix Litigation*, ECF 1.

[66]  *Compare id. with* ECF 1, ¶ 74 ("The complaint was filed by Southeast Ready Mix and Mayson Concrete, and it alleged much of the same conduct that was inflicted upon Premier.").

limitations has been tolled, 'the means of knowledge are the same thing as knowledge itself.'") (quoting *Wood v. Carpenter*, 101 U.S. 135, 143 (1879)). Moreover, the allegations in the *SE Ready Mix Litigation* complaint were well-publicized.[67]

The Complaint plainly alleges facts demonstrating that Premier should have known it had potential claims against Defendants when the Woods saw the *SE Ready Mix Litigation* complaint in August 2017. *Lehman v. Lucom*, 727 F.3d 1326, 1331–32 (11th Cir. 2013) (concluding RICO complaint was barred by four-year statute of limitations where plaintiff had filed separate complaint more than four years before that contained allegations "strikingly similar" to those in the RICO

---

[67] *See, e.g.*, *Ready Mix Companies File Antitrust Lawsuit in Atlanta Federal Court*, LAW FIRM NEWSWIRE (BLOG), Aug. 23, 2017, 2017 WLNR 25967227 (describing lawsuit as alleging Argos was the "ringleader" of cement and ready mix cartels in coastal Georgia and southeast coastal South Carolina).

The Court refers to the press coverage of the *SE Ready Mix Litigation* not to comment on its accuracy or truthfulness but to demonstrate that allegations similar to those now being made by Premier were in the public arena in August 2017. *See In re Beef*, 600 F.2d at 1170 (noting that "[n]umerous federal courts have suggested that plaintiffs are chargeable with knowledge of the contents of public records"; indicating that "it is abundantly clear that the plaintiffs knew or should have known . . . of the allegations of the Bray complaint. The Bray case was widely publicized in numerous issues of numerous trade publications . . . .").

complaint; noting that claim-accrual rule in civil RICO actions was derived from the rule applicable to Clayton Act claims).

Given the allegations here, nothing in Premier's pleading provides any—let alone plausible—factual support to suggest that it was *not* on inquiry notice as of August 2017. A "reasonably diligent plaintiff" would have been able to uncover the alleged fraud no later than that point. *Morton's Mkt.*, 198 F.3d at 836 (citations omitted). To be clear, Premier did file its Complaint within four years after August 2017. But the Court is skeptical that Premier's decision to wait over two years to file suit after belatedly discovering a basis for its claims demonstrates the necessary diligence.

More crucially, the allegations in the Complaint demonstrate that Premier was likely on inquiry notice even before 2017. As to the Ready-Mix Defendants' anticompetitive efforts, in 2009, an officer of the Elite Defendants asked Keith Woods if Premier would refrain from competing in the Savannah area.[68] In 2010, the Argos Defendants started undercutting Premier on bids for concrete jobs and gained access to Premier's customer and price lists.[69] In 2012, the Argos and Elite Defendants worked together to gain Premier's customers by following its trucks

---

[68]   ECF 1, ¶¶ 35.a.

[69]   *Id.* ¶¶ 35.c., 35.d.

to job sites and undercutting it on pricing.[70] In 2013, Coastal asked Keith Woods if he would "give up" and invest in Coastal or sell Premier to Coastal.[71]

As to the Cement Defendants, in June 2009, the Argos Defendants stopped supplying Premier with cement.[72] Within two hours of each other in February 2011, representatives of the Argos Defendants, Giant, and Holcim informed Premier that they would be increasing cement prices—even though the Argos Defendants and Holcim did not sell to Premier at that point.[73] These Defendants gave Premier similar notice of a price increase in 2013.[74] In 2013 and 2014, the Argos Defendants refused to sell to Premier.[75] In 2014–2015, Giant informed Premier that it would no longer supply Premier with cement effective immediately.[76] As alleged, this is conduct Premier would have been aware of as it was happening.

---

[70]   *Id.* ¶ 35.f.

[71]   *Id.* ¶ 35.i.

[72]   *Id.* ¶ 35.b.

[73]   *Id.* ¶ 35.e.

[74]   *Id.* ¶ 35.j.

[75]   *Id.* ¶ 35.k.

[76]   *Id.* ¶ 35.*l.*

Premier has failed to satisfy Rule 9(b) with regard to its assertions that its claims are subject to equitable tolling. Well-pleaded allegations about what Premier knew, when it knew it, Defendants' efforts at concealment (if any), and Premier's due diligence may cure the pleading deficiencies. *See, e.g.*, *La Grasta*, 358 F.3d at 845; *Summer*, 664 F.2d at 970–71. Accordingly, Premier is permitted to amend its Complaint to adequately plead that its Sherman Act claims are not barred by the statute of limitations.

### C.   Claims against the Ready-Mix Defendants

Since Premier will be given the opportunity to replead with regard to the timeliness of its claims, the Court  will also address the substantive adequacy of Premier's causes of action.

#### 1.   Joint monopoly (Counts I & II)

The Complaint accuses the Ready-Mix Defendants of joint monopolization, attempted joint monopolization, and conspiracy to jointly monopolize in violation

of Section 2 of the Sherman Act.[77] Section 2 prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. A person who is "injured in his business or property by reason of anything forbidden in the antitrust laws" can sue for treble damages under the Clayton Act. 15 U.S.C. § 15(a). *See also Spanish Broad. Sys.*, 376 F.3d at 1074. Although *Spanish Broadcasting Systems* did not involve allegations of a joint monopoly, the ruling suggests that a monopoly can only be held by a single entity. The Eleventh Circuit stated that, under Section 2, "the alleged monopolist must possess enough power or potential power in this 'relevant market' in order to harm competition." *Id.* at 1074 (citation omitted). *See also id.* at 1075 (noting court was unable to locate a case where "a minority shareholder can attempt to monopolize a market on behalf of its subsidiary").

---

[77] *Id.*, Counts I–III. The reply in support of the Joint Motion asserts that Premier abandoned these claims by failing to respond to them in its opposition to the Joint Motion. ECF 143, at 6. Premier did, however, present arguments in support of its joint monopoly causes of action in its opposition to the Elite Defendants' separate brief in support of the Joint Motion. ECF 136, at 6–11. Given the extent and complexity of the briefing on Defendants' motions, the Court does not treat the claims in Counts I, II, and III as having been abandoned.

Courts—including one in this district—have rejected the idea that Section 2 prohibits "joint" monopolization or attempting to create a joint monopoly. *See, e.g., In re Delta/Airtran*, 733 F. Supp. 2d at 1366 (describing the theory as "novel" and citing cases from, *inter alia*, Second, Seventh, and Ninth Circuits rejecting joint monopolization theory at motion to dismiss stage);[78] *JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-cv-1585-T24-MAP, 2005 WL 1126665, at *18 (M.D. Fla. May 9, 2005) (at summary judgment); *Sun Dun, Inc. of Wash. v. The Coca-Cola Co.*, 740 F. Supp. 381, 390 (D. Md. 1990) (indicating that, "in order to sustain a charge of monopolization or attempted monopolization, a plaintiff must allege the necessary market domination of a *particular* defendant") (emphasis added) (citation omitted).

Premier alleges that the members of the Ready-Mix Cartel "jointly possess monopoly power" in the ready-mix concrete market, with the power to exclude competition and artificially raise prices.[79] This power permitted the members to engage in (among other things) predatory and "supra-competitive" pricing and

---

[78]   *H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1018 (2d Cir. 1989); *Midwest Gas Servs., Inc. v. Ind. Gas. Co.*, 317 F.3d 703, 713 (7th Cir. 2003); *Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1416 (7th Cir. 1989); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995).

[79]   ECF 1, ¶ 87.

bid rigging.[80] The Joint Motion argues that these causes of action must be dismissed because joint monopolization is not a cognizable cause of action under Section 2.[81] The Court agrees that Premier's claims are based on joint monopolization.[82] Accordingly, Counts I and II must be dismissed.

### 2. Conspiring to monopolize (Count III)

In contrast to the theory of a "joint" monopoly, it is possible for two or more entities to be liable for *conspiring* to achieve a monopoly:

> [U]nder the statute, there are three distinct claims that can be brought: (1) monopolization; (2) attempt to monopolize; and (3) conspiracy to monopolize. As has been explained, Plaintiffs elected to proceed pursuant to prong (2) alleging that Defendants engaged in attempted monopolization. The fact that a separate offense (a conspiracy claim) exists under the statute for concerted action pertaining to monopolization suggests that any joint monopoly theory must be brought pursuant to that subsection of the statute rather than pursuant to the "attempted monopolization" prong.

*In re Delta/Airtran*, 733 F. Supp. 2d at 1367 n.14 (citation omitted). Multiple firms can thus conspire to make *one* of them a monopolist.

---

[80]  *Id.* ¶ 89.

[81]  ECF 97-1, at 13–16. Premier does not respond to this argument in its briefing. Accordingly, the Court treats this portion of the Joint Motion as unopposed. LR 7.1(B), NDGa.

[82]  *See, e.g.*, ECF 1, ¶¶ 87, 93, 98, 100.

The problem here is that Premier is asserting that the Ready-Mix Defendants conspired to create a *joint* monopoly. This claim therefore faces the same problems as Counts I and II—Section 2 does not encompass the idea of joint monopolies. "[A] § 2 claim can only accuse one firm of being a monopolist." *Midwest Gas Servs., Inc. v. Ind. Gas. Co.,* 317 F.3d 703, 713 (7th Cir. 2003). While, an "[o]ligopoly can, in some cases, violate Sections 1 and/or 3 of the Sherman Act, [ ] *competitors,* by conspiring to maintain or create an oligopoly, do not run afoul of the Section 2 prohibitions against monopoly." *Sun Dun,* 740 F. Supp. at 390 (noting that "an attempt to allege the necessary market power by aggregating the market power of several defendants is mere tautology") (citing *Consol. Terminal Sys., Inc. v. ITT World Commc'ns, Inc.,* 535 F. Supp. 225, 228 (S.D.N.Y. 1982)). Therefore, Count III must also be dismissed.

### 3.   Group boycott (Count IV)

Count IV of the Complaint alleges that the Ready-Mix Defendants engaged in a conspiracy to restrain trade, *i.e.,* a group boycott, in violation of Section 1.[83]

---

[83]   *Id.* at 49–50.

### i.    Effects on interstate commerce

At the outset, the Elite Defendants argue that Premier failed to allege conduct by Defendants affecting interstate commerce.[84] Premier responds that the Complaint alleges that the group boycott affected "both the Georgia and South Carolina markets" and pleads facts that "allege activity crossing state lines and [a]ffecting the commerce of multiple states."[85]

The Complaint alleges that the "relevant geographic market" for cement spans "coastal Georgia and coastal South Carolina,"[86] indicating that the cement market crosses state lines. In contrast, the Complaint alleges that the ready-mix concrete market is, necessarily, "highly localized."[87] In fact, according to the Complaint, the ready-mix concrete markets at issue here—Statesboro, Georgia; Savannah, Georgia; and Hilton Head/Bluffton, South Carolina are each "too far away from one another for a plant in one of these locations to profitably service another."[88] These allegations show the exact opposite of activity crossing state lines—because the radius of possible customers for a plant in each market is only

---

[84]   ECF 98, at 5.

[85]   ECF 136, at 14–15.

[86]   ECF 1, ¶ 59.

[87]   *Id.* ¶ 61.

[88]   *Id.* ¶ 61.b.

20 to 30 minutes, there is no clear allegation in the Complaint that there is any cross-over between the "highly localized" Georgia markets and the "highly localized" South Carolina markets.[89] Nor does the Court find any other allegations in the Complaint that show the interstate effects of the ready-mix concrete markets.

In light of the actual allegations in the Complaint and lack of facts about how the at-issue ready-mix concrete markets affect interstate commerce, the Complaint fails to plead a necessary element of a Section 1 claim against the Ready-Mix Defendants.

> [J]urisdiction may not be invoked under [the Sherman Act] unless the relevant aspect of interstate commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce. To establish jurisdiction a plaintiff must allege the critical relationship in the pleadings . . . .

*McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 242 (1980). *See also id.* at 241–42 (indicating that jurisdictional requirement may be satisfied under either an "in commerce" or "effect on commerce" theory). Given the sweep of the Commerce Clause and the "correspondingly broad reach of the Sherman Act," *id.*

---

[89]   *Id.* ¶ 61.a.

at 241, Premier may be able to satisfy one of these standards. At the moment, however, it has failed to do so.

### ii.   The parties' arguments

Premier contends that the Ready-Mix Defendants sought to exclude Premier (and others) from the ready-mix concrete markets.[90] This purportedly caused consumers of the product to "pay supra-competitive prices while receiving lower quality ready-mix concrete."[91] In the Joint Motion, the Ready-Mix Defendants assert that Premier has not pleaded facts showing the existence of an agreement or that Premier was excluded from the market, and thereby lacks standing.[92] Further, these Defendants argue that, as a competitor, Premier does not have standing to assert a Section 1 claim based on price-fixing.[93]

Premier responds that it is not asserting a Section 1 claim based on price-fixing. Rather, its contention is that it and other ready-mix competitors were excluded from the ready-mix market because they refused to participate in the

---

[90]   *Id.* ¶ 105.

[91]   *Id.* ¶ 107.

[92]   ECF 97-1, at 17–26.

[93]   *Id.* at 18–19. The Evans Defendants make a similar argument in their brief in support of the Joint Motion. ECF 100, at 3 ¶¶ 6–7; *id.* at 4 ¶ 8.

price-fixing conspiracy.[94] Premier also argues that those ready-mix companies that refused to participate in the conspiracy were targeted by the Cement Cartel, which refused to sell them the cement they needed to engage in the ready-mix market.[95] In addition, Premier points to direct and indirect evidence of the Ready-Mix Defendants' agreement and efforts to exclude Premier from the market.[96]

### *iii.* Analysis

It is true that a company does not suffer an antitrust injury if its competitors engage in price fixing. *Atlantic Richfield Co. v. USA Petro. Co.*, 495 U.S. 328, 337 (1990) ("A competitor 'may not complain of conspiracies that . . . set minimum prices at *any* level.'") (quoting *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.8 (1986)).[97] This is because the company would stand to gain from a conspiracy to raise market prices. *Id.* "The antitrust laws were enacted for 'the protection of *competition*, not *competitors*.'" *Id.* at 338 (quoting *Brown Shoe Co.*

---

[94]  ECF 130, at 7, 15–17.

[95]  *Id.* at 8.

[96]  ECF 130, at 8–14.

[97]  Although this maxim was directed at vertical, maximum price fixing allegations, the Supreme Court made clear that a plaintiff alleging horizontal price fixing must also demonstrate that it was injured by the scheme in order to have standing. *Atlantic Richfield*, 495 U.S. at 344–45. *See also Matsushita*, 475 U.S. at 582.

*v. United States*, 370 U.S. 294, 320 (1962)). However, it is also true that a company can suffer an antitrust injury if it is the target of a group boycott. And that is exactly what Premier alleges.

In *Klor's Inc. v. Broadway-Hale Stores, Inc.*, the Supreme Court considered antitrust claims made by a retail store (Klor's) that a competing department store, national manufacturers, and distributors of the manufacturers conspired not to sell to Klor's at all or only to sell at discriminatory prices. 359 U.S. 207, 208–09 (1959). The Ninth Circuit affirmed the district court's dismissal of the claims and entry of summary judgment.[98] The Supreme Court characterized the appellate court's decision as follows:

> [I]f correct, [the Ninth Circuit ruling] means that unless the opportunities for customers to buy in a competitive market are reduced, a group of powerful businessmen may act in concert to deprive a single merchant, like Klor, of the goods he needs to compete effectively.

*Id.* at 210.

The Supreme Court reversed, concluding that "Klor's allegations clearly show one type of trade restraint and public harm the Sherman Act forbids." *Id.* It

---

[98] The case was effectively in the early, pre-discovery stage when it was dismissed. The defendants submitted affidavits in support of their motions to dismiss and for summary judgment, which were then considered by the district court. 359 U.S. at 209–11.

made clear that "[g]roup boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category" of activities in restraint of trade: "Even when they operated to lower prices or temporarily to stimulate competition they were banned." *Id.* at 211–12 (citations omitted). *See also Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 290 (1985) ("This Court has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act."); *id.* at 293 ("Group boycotts are often listed among the classes of economic activity that merit *per se* invalidation under § 1.") (internal quotation marks omitted) (citations omitted).

Similar to the facts in *Klor's*, Premier's Section 1 cause of action in Count IV is not based on a contention that Premier was somehow injured because of the Ready-Mix Defendants' alleged price-fixing scheme. Rather, this count clearly asserts a claim for group boycott that resulted from Premier's refusal to engage in the price-fixing scheme.[99] Because of Premier's refusal, the Ready-Mix Defendants,

---

[99]   ECF 1, ¶ 105 (the Ready-Mix Cartel "combined and conspired to restrain trade in violation of Sherman Act Section 1 by engaging in a scheme to exclude Premier and other nonparticipating competitors from the market for ready mix concrete . . . *in order to succeed* in their price-fixing scheme") (emphasis added).

as alleged, "predatorily undercut[ ]" Premier's pricing to its clients and undertook efforts to raise the prices Premier paid for cement or prevented it from buying cement at all.[100] The Argos Defendants helped members of the Ready-Mix Cartel withstand these high cement prices by providing them with substantial rebates.[101] These Defendants carved out areas of the ready-mix concrete market ("Green Zones"), divided the areas amongst themselves, and engaged in predatory pricing to ensure that non-cartel members would be excluded from those areas.[102] These details sufficiently allege a common understanding and not unilateral action by the individual Ready-Mix Defendants. *In re Delta/Airtran*, 733 F. Supp. 2d at 1359. The Joint Motion inappropriately tries to focus on these allegations in isolation, rather than assessing the Complaint as a whole.

Further, the fact that the Ready-Mix Defendants (other than Argos) did not sell cement to Premier (as the reply in support of the Joint Motion points out[103]) does not sufficiently distinguish *Klor's*. What Premier alleges is the concerted effort to exclude it from the ready-mix market. The competing department store

---

[100]  *Id.* ¶ 35.

[101]  *Id.* ¶ 31.d.

[102]  *Id.* ¶¶ 41–43.

[103]  ECF 143, at 13.

defendant in *Klor's* did not sell goods to the plaintiff, but the Supreme Court still reversed the dismissal and remanded the action for trial. 359 U.S. at 214. Moreover, the Supreme Court has stated that "agreements between competitors to allocate territories to minimize competition"—such as the Green Zones alleged here—"are illegal," describing them as "[o]ne of the classic examples of a *per se* violation of § 1." *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1990) (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)). *See also Langston Corp. v. Standard Register Co.*, 553 F. Supp. 632, 638 (N.D. Ga. 1982) (noting that "[c]onventional group boycotts" are *per se* violations of Section 1, but that this rule is "narrow"; "In a conventional boycott, actors at one level in the chain of distribution seek to exclude competitors or those who seek to compete by concerted action to deprive them of some trade relationship which they need to compete effectively.") (citation omitted).

While the Court need not decide at this point whether the group boycott alleged by Premier is a *per se* violation of Section 1, the Complaint's allegations are sufficient to show that Premier has standing to assert a cause of action under Section 1.

### a.    The Evans Defendants

The separate brief in support of the Joint Motion filed by the Evans Defendants (Evans Concrete Holdings, Inc. and Evans Concrete, LLC) argues that the individual allegations against it are insufficient to state a claim. As does the Joint Motion, these Defendants focus on the Complaint's allegations in isolation from one another rather than in the context of the entire pleading.

Premier alleges that the Evans Defendants were part of the Ready-Mix Cartel; engaged in discussions with the Argos Defendants about how to predatorily underprice ready-mix concrete competitors, including Premier; undertook efforts through the cartel to do the same, including receiving an allocation of customers the cartel attempted (or was attempting) to take from Premier; participated in bid-rigging and price-fixing; and participated in the Green Zones.[104] Viewing these allegations as a whole, the Complaint contains sufficient facts to plausibly allege that the Evans Defendants were part of the Ready-Mix Cartel and the group boycott. *Twombly*, 550 U.S. at 556.

### b.    Coastal and the Thomas Defendants

In their motion to dismiss, the Thomas Defendants argue that they are only part of this litigation because Defendant Thomas Concrete of South Carolina, Inc.

---

[104] *Id.* ¶¶ 3, 34–35, 35.o., 39.g, 39.i., 39.j., 42.

purchased certain assets of Coastal in 2015.[105] The Thomas Defendants are, however, allegedly members of the Ready-Mix Cartel independent of any alleged association with Coastal.[106] The Complaint asserts that as to the Thomas Defendants, their "employees, and agents participated personally in the unlawful conduct" and "[t]o the extent [the] Thomas [Defendants] did not personally participate, [they] authorized, set in motion, or otherwise failed to take necessary steps to prevent the acts complained of" in the Complaint.[107] In March and April 2016, the Argos Defendants purportedly told its salespeople not to compete with the Thomas Defendants for jobs (because of the latter's participation in the Ready-Mix Cartel).[108]

As for Coastal, its alleged participation in the cartel began in 2010, when it started discussions with the Argos Defendants and others concerning "strategies to undercut" the pricing of a competitor in the market.[109] In February 2012, Coastal allegedly exchanged price-increase letters with the Argos Defendants and others

---

[105]  ECF 92-1, at 6.

[106]  ECF 1, ¶¶ 24, 29.

[107]  *Id.* ¶ 24.d.

[108]  *Id.* ¶¶ 35.o. & 35.p.

[109]  *Id.* ¶ 34.

to "confirm [these parties'] compliance with the agreement to increase prices."[110] The Argos Defendants told their sales people that they "were not allowed to undercut" Coastal's prices.[111] Later in 2012, Coastal agreed with other members of the cartel to "coordinated price increases" and discussed additional coordinated price increases.[112] In 2013, Coastal's then-president and one of its investors asked Keith Woods to "give up" and become a shareholder of Coastal or to sell Premier to Coastal.[113] In October 2013, Coastal and the Argos Defendants issued price increase letters (that presumably reflected coordinated pricing, although the Complaint does not specifically allege this).[114] The Argos Defendants, along with Coastal, the Thomas Defendants, and others, supposedly "combined and conspired to restrain trade" in violation of Section 1 of the Sherman Act.[115]

The Complaint sufficiently alleges that Coastal and the Thomas Defendants were part of the Ready-Mix Cartel.

---

[110]   *Id.* ¶ 35.g.

[111]   *Id.* ¶ 35.h.

[112]   *Id.* ¶¶ 38, 39.f.

[113]   *Id.* ¶ 35.i. (internal quotation marks omitted).

[114]   *Id.* ¶ 39.k.

[115]   *Id.* ¶ 105.

### c.    The Elite Defendants

The Elite Defendants (Elite Concrete, LLC; Elite Concrete Holdings, LLC; and Elite Concrete of SC, LLC) assert that the Complaint does not contain any allegations of their purported participation in the Ready-Mix Cartel after January 22, 2016.[116] The Court agrees. In fact, the Complaint asserts that by April 27, 2016, the Elite Defendants were no longer part of the cartel.[117] Before that point, however, the Complaint sufficiently pleads that they were part of the cartel.[118] The group boycott claim against the Elite Defendants, therefore, is not subject to dismissal.

---

[116]  ECF 98, at 3–5.

[117]  *Id.* ¶ 35.p.

[118]  *Id.* ¶ 29 (Elite Defendants joined the ready-mix cartel "starting in approximately 2009); ¶ 34 (Elite Defendants and Argos Defendants had a close relationship in 2010 because of the Melton brothers); ¶ 35.a. (in 2009, an Elite Concrete representative asked if Premier would not compete in Savannah area); ¶ 35.f. (Elite Defendants and Argos Defendants worked together throughout 2012 to take Premier's largest customers); ¶ 35.g. (Elite Defendants and Argos Defendants exchanged price-increase letters on February 28, 2012); ¶ 35.p. (as of April 27, 2016, Elite Defendants no longer participated in ready-mix cartel); ¶ 39.i. (Elite Defendants agree to price increases); ¶ 40 (before late 2015, representative of Elite Defendants regularly met with representative of Argos Defendants to "discuss cartel strategy").

*iv.*     **Summary**

The Complaint's group boycott cause of action must be dismissed on statute of limitations grounds. The claim is also subject to dismissal because Premier has failed to allege that the relevant conduct was "in" interstate commerce or affected interstate commerce. The Court rejects as a basis for dismissal the remaining arguments raised in the Joint Motion and the individual briefs and motions filed by the Ready-Mix Defendants.

**D.     Claim against the Cement Cartel (Count VII)**

The only cause of action Premier asserts against the Cement Defendants (the Argos and Cemex Defendants, Giant, and Holcim) is in Count VII for conspiracy to restrain trade (price fixing) in violation of Section 1.[119]

**1.     The parties' arguments**

The Joint Motion argues that the Complaint lacks sufficient facts to make plausible the allegation that the Cement Cartel members agreed to fix prices.[120] The Joint Motion emphasizes the individual allegations against the Cement Defendants rather than viewing the Complaint in its entirety.[121] Premier responds

---

[119]   ECF 1, Count VII.

[120]   ECF 97, at 29–31. *See also* ECF 95-1, at 6–8, 15–26; ECF 143, at 15–17.

[121]   ECF 97, at 29–31.

that it has alleged direct evidence of an agreement, as well as "plus factors" in support of allegations about the Cement Defendants' price-fixing conspiracy.[122] In addition to the arguments in the Joint Motion, the Cemex Defendants and Giant make additional arguments in their separate motions to dismiss.[123]

### i.  The Cemex Defendants

The Cemex Defendants argue that the Complaint does not allege they were part of the relevant cement market, such that there are no plausible allegations they participated in the conspiracy.[124] These Defendants also contend that the parallel conduct described in the Complaint and lack of "plus factors" mean that Premier's Section § 1 claim fails.[125] Premier responds that its allegations are sufficient at the pleading stage to establish the Cemex Defendants' participation in

---

[122]  ECF 130, at 4–6, 21–24.

Although Premier's opposition to the Joint Motion asserts that Coastal was part of the Cement Cartel, *id.* at 21, the Court does not read the Complaint to make any such allegation. *See, e.g.*, ECF 1, ¶¶ 2, 64.

[123]  To the extent the separate motions filed by these Defendants raise arguments addressed in the Joint Motion, such arguments are discussed collectively herein.

[124]  ECF 102-1, at 12–15.

[125]  *Id.* at 20–21.

the relevant market and cartel—especially given the concealed nature of most of the Cement Defendants' conduct.[126]

### ii.   Giant

In its separate motion to dismiss, Giant asserts that the conduct alleged in the Complaint is "completely consistent" with independent, rather than collective, conduct.[127] Similar to the Cemex Defendants, it argues that such "conscious parallelism" is not prohibited by the Sherman Act.[128] Giant contends that Premier has failed to plead sufficient "plus factors" to make the Complaint's allegations "more probative of conspiracy than of conscious parallelism."[129] Premier responds that Giant is attempting to apply too stringent a legal standard at this stage and that it has plausibly alleged a conspiracy and plus factors.[130]

### 2.   Analysis

Reading the pleading liberally, as the Court must, the Complaint alleges that, from 2012 through 2016, the members of the Cement Cartel "conspired to fix

---

[126]  ECF 132, at 2–6.

[127]  ECF 95-1, at 15. *See generally id.* at 15–26.

[128]  *Id.* at 16.

[129]  *Id.* at 17 (quoting *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1301 (11th Cir. 2003)).

[130]  *See generally* ECF 131, at 3–6, 9–10.

prices in the cement market" and to trade "competitively sensitive information,"
and that the Argos Defendants would determine how much cement ready-mix
concrete competitors were buying, in order to help the Ready-Mix Cartel drive
those competitors out of the ready-mix market.[131] The Argos Defendants and
Holcim allegedly coordinated to not supply cement to Premier.[132] The Cement
Cartel members discussed and agreed to coordinated price increases, which were
sometimes announced to Premier by the ostensibly competing cement companies
on the same day.[133]

In *In re Delta/Airtran*, the Court held that the following allegations of
antitrust violations were sufficient to survive dismissal:

> Defendants (1) engaged in collusive communications
> through earnings calls and industry conferences;
> (2) aligned their business practices following the
> collusive communications; (3) implemented business
> practices contrary to their self-interest following the
> communications; (4) offered a pretextual explanation for
> the implementation of the first-bag fee; and
> (5) undertook this concerted action to achieve higher
> revenues at the expense of higher prices for consumers.

733 F. Supp. 2d at 1361.

---

[131]  ECF 1, ¶¶ 31.b., 31.c., 48.

[132]  *Id.* ¶ 31.e.

[133]  *Id.* ¶¶ 35.e., 35.j., 48.a., 48.b., 48.c., 48.d.

At this stage, the Court believes Premier's similar allegations are sufficient to withstand scrutiny. "Courts have [ ] found that unlawful conspiracies may be inferred when collusive communications among competitors precede changed/responsive business practices, such as new pricing practices." *Id.* at 1360 (citing, *inter alia*, *Helicopter Support Sys., Inc. v. Hughes Helicopter, Inc.*, 818 F.2d 1530, 1535 (11th Cir. 1987)). *See also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627–28 (7th Cir. 2010) ("Parallel behavior of a sort anomalous in a competitive market is thus a symptom of price fixing, though standing alone it is not proof of it; and an industry structure that facilitates collusion constitutes supporting evidence of collusion.").

Given (among other things) the alleged market-share distribution among the Cement Defendants in each geographic region,[134] the Complaint's allegations are more probative of collusion than of parallel price changes. While the Cemex Defendants' and Giant's arguments concerning conscious parallelism may be sufficient at summary judgment, reliance on *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287 (11th Cir. 2003), at the motion to dismiss stage is misplaced. *Id.* at 1300–01 ("In order to ensure that only potentially meritorious claims survive

---

[134] *See, e.g., id.* ¶¶ 46, 64.

summary judgment, the Supreme Court has required that inferences of a price fixing conspiracy drawn from circumstantial evidence be reasonable. In practice, this means that to survive a motion for summary judgment . . . a plaintiff seeking damages for [collusive price fixing] . . . must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.") (cleaned up). Moreover, Giant's arguments that it supplied cement to Premier during the relevant period, and at lower prices than the other Cement Defendants, would impermissibly require the Court to interpret the Complaint in the light most favorable to *Giant*.[135] *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1274 (11th Cir. 1999).

Although the Cemex Defendants argue that Premier concedes they do not serve the cement markets at issue, that is an inappropriately narrow reading of the Complaint. The pleading does allege that the Cemex Defendants had a significant market share in Atlanta.[136] The Complaint also asserts that their participation in the Cement Cartel made the price-fixing scheme more effective.[137] The cartel

---

[135]  ECF 95-1, at 22–23.

[136]  ECF 1, ¶ 46.

[137]  *Id.*

members coordinated and set prices collectively with each other.[138] The relevant market for cement spans coastal Georgia and coastal South Carolina, and cement suppliers can reasonably service customers within 200 miles of their mills.[139] There is no suggestion in the Complaint that the Cemex Defendants are not part of that market.

Accordingly, the Court concludes that Count VII against the Cement Defendants is not subject to dismissal other than on the statute of limitations grounds discussed above. But, as noted in *In re Delta/Airtran*, "[a]lthough the Court reaches this conclusion, it does not do so lightly. The complaint has its weaknesses." 733 F. Supp. 2d at 1362 (cleaned up). *See also Twombly*, 550 U.S. at 556 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.") (cleaned up). Unlike the allegations against the Ready-Mix Defendants, Premier's assertions with regard to the Cement Defendants lack some detail. For example, the Complaint does not supply any facts that suggest an economic motive for the Cemex Defendants, Giant, and Holcim to have conspired with the Argos Defendants in a way that only appeared to benefit the Argos

---

138  *Id.* ¶¶ 31.f., 48.b., 48.c.

139  *Id.* ¶¶ 59–60.

Defendants. Perhaps such evidence will be flushed out through discovery, or perhaps not. At this stage, however, the Court concludes that Premier's well-pleaded allegations are not subject to dismissal on this basis.

### E. Remaining claims

#### 1. Premier lacks standing to seek injunctive and declaratory relief.

In order to seek injunctive relief, an antitrust plaintiff must show that there is a "significant threat of injury from an impending violation of the antitrust laws." *In re Delta/Airtran*, 733 F. Supp. 2d at 1367 (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969)). *See also Wooden v. Bd. of Regents of the Univ. Sys. of Ga.*, 247 F.3d 1262, 1283 (11th Cir. 2001) ("[T]o have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.") (footnote omitted); *Von Der Werth*, 2009 WL 10669723, at *7 (citing *Wooden*, 247 F.3d at 1284). Similarly, "[d]eclaratory relief is by its nature prospective. For a plaintiff seeking prospective relief to have standing, he must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *McGee v. Solicitor Gen. of Richmond Cnty., Ga.*, 727 F.3d 1322, 1325 (11th Cir. 2013) (cleaned up).

Although the Complaint alleges that the Cement Cartel's activities have continued through the present,[140] there is no corresponding allegation concerning the Ready-Mix Cartel. Moreover, there is no suggestion that Premier could be harmed in the future by either cartel since the Woods sold all of its operational assets over two years ago.[141] Accordingly, Count VIII for declaratory judgment is **DISMISSED**, along with any request for injunctive relief as to Premier's Sherman Act claims (Counts I through VII and the *ad damnum* clause).

### 2. Abandoned claims

The Joint Reply argues that, because Premier did not respond to arguments about eight of the ten causes of action, Premier has abandoned those claims.[142] The Court agrees that Premier has abandoned its monopolization and attempted monopolization claims against the Argos Defendants (Counts V and VI), and its state-law claims (Counts IX and X). Premier did not present any arguments concerning those counts in any of its responses to Defendants' various motions to dismiss. *Coalition for the Abolition of Marijuana Prohib. v. City of Atlanta*, 219 F.3d 1301, 1325–26 (11th Cir. 2000) (indicating that party can abandon issue by failing

---

[140]  ECF 1, ¶ 120.

[141]  *Id.* ¶¶ 18–19.

[142]  ECF 143, at 6.

to brief and argue it before the district court; citing cases). *Cf. McMaster v. United States*, 177 F.3d 936 (11th Cir. 1999) (allegations raised in complaint but not argued to district court abandoned).

## IV.   Conclusion

This Order disposes of the following motions: the Thomas Defendants' Motion to Dismiss [ECF 92]; Holcim's Motion to Dismiss [ECF 94]; Giant's Motion to Dismiss [ECF 95]; the Joint Motion to Dismiss [ECF 97]; the Evans Defendants' Motion to Dismiss [ECF 100]; and the Cemex Defendants' Motion to Dismiss [ECF 102]. All claims by Plaintiffs Keith and Joy Woods are **DISMISSED**. All claims by Premier are **DISMISSED**; however, within 21 days after entry of this Order, it will be permitted to file an Amended Complaint consistent with the Court's rulings. Defendants shall have 14 days thereafter to respond to the Amended Complaint.

**SO ORDERED** this the 31st day of March 2021.

_____
Steven D. Grimberg
United States District Court Judge